**Thomas WRIGHT, Plaintiff,**

v.

**Thomas A. COUGHLIN,
et al., Defendants.**

**No. 93–CV–601S(F).**

United States District Court,
W.D. New York.

Dec. 17, 1998.

Thomas Wright, Fallsburg, NY, pro se.

Dennis C. Vacco, Attorney General, State of New York, Kim S. Murphy, Assistant Attorney General, of counsel, Buffalo, NY, for defendants.

## DECISION and ORDER

FOSCHIO, United States Magistrate Judge.

### JURISDICTION

The parties executed a consent to proceed before the undersigned on March 6, 1995. By order of March 18, 1996, this court denied Plaintiff's motion to reconsider the District Court's judgment dismissing his claims as to two defendants and granting summary judgment to another. Following appeal, the Second Circuit, on January 5, 1998, vacated the decision of this court, and remanded for further proceedings. The matter is presently before the court on Defendants' motion for summary judgment, filed February 18, 1998 (Docket Item No. 47), and Plaintiff's cross-motion for summary judgment ("Plaintiff's Cross-Motion"), filed May 1, 1998 (Docket Item No. 57).

### BACKGROUND

Plaintiff, Thomas Wright, filed this action under 42 U.S.C. § 1983 on July 19, 1993 alleging that his Fourteenth Amendment due process rights were violated by Defendants Coughlin, Selsky, Kelly, Bennedict, and Kihl in relation to disciplinary hearings conducted at the Attica Correctional Facility on May 31, 1990 by Defendant Bennedict and June 5, 1991 by Defendant Kihl.

On March 1, 1994, Defendants Selsky and Coughlin moved to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(1) and Defendant Bennedict moved to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(1) and (6). Thereafter, on June 2, 1994, Defendants Selsky and Coughlin filed a motion to dismiss the complaint pursuant to Fed.R.Civ.P.

12(b)(6). On June 3, 1994, Defendant Kihl filed a similar motion.

On December 1, 1994, District Judge Skretny issued a Decision and Order granting Defendants Coughlin, Selsky, Bennedict, and Kihl's motions to dismiss. Judge Skretny found that Defendant Coughlin did not have any personal involvement in the matter at issue in this case, a necessary prerequisite to a finding of liability under § 1983, that the claim as to Defendant Bennedict was untimely, and that Defendants Selsky, as the Deputy Commissioner of the New York State Department of Correctional Services, and Kihl, as the disciplinary hearing officer who conducted Plaintiff's second disciplinary hearing at Attica, were entitled to absolute immunity for their actions. This matter was referred to the undersigned by Judge Skretny on December 6, 1994 (Docket Item No. 28) for a report and recommendation on all remaining dispositive motions.

Thereafter, on April 27, 1995, Plaintiff moved pursuant to Fed.R.Civ.P. 60(b) seeking to vacate Judge Skretny's order as to Defendants Selsky and Kihl on the ground that, under recently decided Second Circuit precedent, *Young v. Selsky,* 41 F.3d 47 (2d Cir.1994), and *Tulloch v. Coughlin,* 50 F.3d 114 (2d Cir.1995), neither Defendant was entitled to absolute immunity. Defendant Kelly moved for summary judgment on July 31, 1995 (Docket Item No. 34). Plaintiff filed an affidavit in opposition to Kelly's motion on September 28, 1995 (Docket Item No. 41) ("Plaintiff's Affidavit").

Although noting that, based upon *Young* and *Tulloch,* Defendants Selsky and Kihl were entitled to qualified rather than absolute immunity, this court denied Plaintiff's motion to vacate and granted Defendant Kelly's motion for summary judgment by Decision and Order dated March 18, 1996 (Docket Item No. 42), finding Plaintiff's disciplinary confinement was not "atypical and significant," a threshold requirement to application of federal due process protections established in *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). *Wright v.*

*Coughlin,* 93–CV–601S(F) (slip op. W.D.N.Y. March 18, 1996) at 13–14.

Plaintiff appealed the denial of his motion to vacate, asserting that the court erred in finding that his disciplinary confinement was not an atypical and significant hardship, thus rendering consideration of the merits of his due process claim unnecessary. Specifically, Plaintiff contended the court failed to consider duration as a factor in determining whether his confinement constituted an atypical and significant hardship. Plaintiff further argued that the court should not have granted summary judgment as disputed evidentiary issues remained.

The Second Circuit vacated this court's decision and remanded the case for further proceedings in light of its recent holdings in *Brooks v. DiFasi,* 112 F.3d 46 (2d Cir.1997), and *Miller v. Selsky,* 111 F.3d 7 (2d Cir. 1997). *Wright v. Coughlin,* 132 F.3d 133, 138 (2d Cir.1998). The Court of Appeals directed that on remand the duration of Plaintiff's SHU confinement as well as any distinctions between disciplinary and administrative confinement should be considered. *Wright, supra,* at 137. The court also found error in the grant of summary judgment to Defendants on the basis that this court had credited only the affidavit of Defendant Kelly in concluding that the conditions of Plaintiff's confinement were not "atypical and significant," and, therefore, had failed to assess the record in the light most favorable to the non-moving party. *Id.,* at 138.

Following remand, Defendants moved, on February 18, 1998, for summary judgment (Docket Item No. 47) and submitted a memorandum in support of the motion (Docket Item No. 50). Plaintiff cross-moved for summary judgment on May 1, 1998 (Docket Item No. 57), together with a memorandum in support of that motion. Defendants also submitted a memorandum in further support of the motion for summary judgment on May 22, 1998 (Docket Item No. 60).

For the reasons which follow, Defendants' motion for summary judgment is GRANTED, and Plaintiff's cross-motion for summary judgment is DENIED.

### FACTS[1]

On May 26, 1990, a disturbance broke out in the C–Block yard at the Attica Correctional Facility where Plaintiff was then housed. Believing that a corrections officer had murdered an inmate, other inmates staged a demonstration that turned violent. Fires were set, benches burned, and windows broken, until the disturbance was brought under control during the morning of May 27, 1990.

According to Plaintiff, he went to the C–Block yard on May 26th to jog and play chess. Knowing nothing about the demonstration about to take place, at approximately 7:00 P.M. he noticed that the other inmates in the yard had ceased all recreational activities. When the demonstration began, the corrections officers left the yard. The demonstration then began to turn violent. At approximately 9:00 P.M., corrections officers began to call some of the inmates back inside, leaving several inmates in the C–Block yard. At 7:00 A.M., on May 27, 1990, the disturbance ended after discussions with the Attica Superintendent, and the inmates went back inside the prison.

Although Plaintiff stated that he merely remained in the yard with the other inmates, playing chess and talking during the disturbance, he was charged in two separate misbehavior reports, with a penal law offense, rioting, arson, and property damage. Specifically, Plaintiff was charged with taking part in a riot and causing damage by breaking windows and burning benches. These charges were based on the personal observations of two corrections officers, one of whom also stated that Plaintiff organized other inmates in gathering the benches for burning, and the other who stated that Plaintiff, carrying a weight bar, repeatedly struck and broke at least fifty windows.

A disciplinary hearing on the misbehavior reports was held by Defendant Bennedict on May 31, 1990, following which Plaintiff was found guilty of all offenses and sentenced to 365 days in the disciplinary Special Housing Unit ("SHU"), the loss of 180 days of good time credit, restitution in the amount of $175, and the loss of telephone and commissary privileges.

On June 6, 1990, Plaintiff filed an administrative appeal of the hearing disposition with Thomas A. Coughlin, Commissioner of the Department of Corrections. Coughlin subsequently delegated review of Plaintiff's claimed violations to Defendant Donald Selsky, Deputy Commissioner of Special Housing and Discipline. On June 11, 1990, Plaintiff sent a letter to Defendant Walter Kelly, Superintendent of Attica Correctional Facility, claiming that he was wrongfully charged with the offenses relating to the prison disturbance, describing the alleged due process violations during the disciplinary hearing, and requesting Defendant Kelly's assistance.

Defendant Bennett's disciplinary hearing disposition was affirmed by Defendant Selsky on August 6, 1990. Plaintiff then filed an Article 78 proceeding in New York Supreme Court, Wyoming County.[2] On May 20, 1991, the Hon. Mark H. Dadd, Acting Supreme Court Justice, vacated the disciplinary hearing decision, including the loss of good time credits, on the ground that the hearing officer, Defendant Bennedict, had improperly failed to investigate the contents of videotapes of the prison disturbance, and directed that a new hearing be held.

A second disciplinary hearing was subsequently held on June 5, 1991 at which Defendant Kihl presided as hearing officer. At that hearing, Kihl viewed the existing videotapes but, for security reasons, did not permit Plaintiff to also view the tapes. While one witness was called, as Plaintiff had requested, Kihl did not allow two other witnesses requested by Plaintiff to testify, believing that the testimony of the witnesses would be used solely to corroborate the testimony of the witness who had testified. At the conclusion of the hearing, Plaintiff was

---

1. As neither Plaintiff nor Defendants have objected to the fact statement of the March 18, 1996 Decision and Order of this court, that statement is adopted here.

2. A special proceeding under the New York Civil Practice Law and Rules, Article 7800 authorizes New York Supreme Court to set aside administrative actions found to be arbitrary, capricious or unlawful, or for lack of substantial evidence. N.Y.Civ.Prac.L. & R. § 7803 (McKinney 1996).

again found guilty of all charges and received a penalty of 168 days of disciplinary SHU, 120 days of keeplock, and the loss of telephone and commissary privileges. Kihl did not impose any loss of good time credits.

Plaintiff appealed Kihl's decision to Selsky on the grounds that Kihl was biased against him and Kihl's determination was not based upon substantial evidence. Plaintiff also argued that the hearing was improperly conducted as he was not allowed to personally view the videotapes of the prison disturbance, and he had been denied the testimony of two witnesses. Defendant Selsky, however, affirmed Kihl's disposition on August 21, 1991.

Plaintiff initiated a second Article 78 proceeding to set aside Kihl's determination. On January 23, 1992, Acting Justice Dadd again found that Plaintiff was denied a fair and impartial hearing based on Kihl's refusal to call two witnesses whom Plaintiff had requested and ordered the hearing determination expunged from Plaintiff's record. At the time of the court's decision, Plaintiff had been released from the SHU, having served his full sentence.

As a result of the guilty determinations, Plaintiff served a total of 288 days in restrictive confinement, including 168 days in the Special Housing Unit and 120 days in keeplock confinement.[3]

### *DISCUSSION*

Summary judgment will be granted pursuant to Fed.R.Civ.P. 56 when the moving party demonstrates that there are no genuine issues as to any material fact and that the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Rattner v. Netburn*, 930 F.2d 204, 209 (2d Cir.1991). The party moving for summary judgment bears the burden of establishing the nonexistence of a genuine issue of material fact. If there is

any evidence in the record based upon any source from which a reasonable inference in the nonmoving party's favor may be drawn, the moving party cannot obtain a summary judgment. *Eastway Construction Corp. v. City of New York*, 762 F.2d 243, 249 (2d Cir.1985).

The function of a district court in considering a summary judgment motion is not to resolve disputed issues of fact, but to determine whether there is a genuine issue to be tried. *Rattner, supra*, at 209. While the court must view the inferences to be drawn from the facts in the light most favorable to the party opposing the motion, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), a party may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). A party opposing a motion for summary judgment may not rest upon the mere allegations or denials of his pleadings, but must set forth "specific facts" showing that there is a genuine issue for trial. Fed. R.Civ.P. 56(e); *Celotex, supra*, at 324, 106 S.Ct. 2548; *Franco v. Kelly*, 854 F.2d 584, 587 (2d Cir.1988). "Mere conclusory allegations or denials" in legal memoranda or oral argument are not evidence and cannot by themselves create a genuine issue of material fact where none would otherwise exist. *Lipton v. The Nature Co.*, 71 F.3d 464, 469 (2d Cir.1995); *Allen v. Coughlin*, 64 F.3d 77, 80 (2d Cir.1995); *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.), *cert. denied*, 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985).

■ Plaintiffs acting *pro se* ordinarily are entitled to "special latitude" when defending against a motion for summary judgment. *Jermosen v. Coughlin*, 1995 WL 144155, *3 (S.D.N.Y.1995). The court, nevertheless, must grant summary judgment if a *pro se* plaintiff fails to make a sufficient showing of concrete evidence on an essential element of

---

**3.** In the present case, Plaintiff served 120 days of the 288 day penalty in the long-term keeplock area, commonly known as the "Snake Pit." According to Plaintiff, this area is an appendage to Attica's Special Housing Unit. Plaintiff's Memorandum of Law in Support of Cross–Motion for Summary Judgment, filed May 1, 1998 (Docket Item No. 57) ("Plaintiff's Memorandum"), ¶ 11.

the case for which he would bear the burden of proof at trial. *Id.; see also Brown v. Crawford,* 906 F.2d 667, 670 (11th Cir.1990), *cert. denied,* 500 U.S. 933, 111 S.Ct. 2056, 114 L.Ed.2d 461 (1991). Unless the nonmoving party provides the court with "concrete evidence from which a reasonable juror could return a verdict in [the nonmoving party's] favor," summary judgment is appropriate. *Anderson, supra,* at 256, 106 S.Ct. 2505.

Plaintiff has alleged that his civil rights were violated by Defendants under 42 U.S.C. § 1983. Pursuant to § 1983, damages may be sought against any person who, under color of state law, subjects an individual to the deprivation of any rights, privileges, or immunities protected by the Constitution or laws of the United States. In this case, Plaintiff claims that his right to due process, as guaranteed under the Fourteenth Amendment, was violated during the conduct of the two disciplinary hearings which led to his SHU confinement. Plaintiff also asserts that the two prior state court determinations which annulled these disciplinary decisions are res judicata in this action. Defendants contend that Plaintiff is not entitled to federal due process and, alternatively, that Plaintiff's due process rights were not violated. Defendants also claim qualified immunity requires they be granted summary judgment. The court will address these points in order.

### 1. *Due Process Claim*

In this case, Plaintiff contends that his constitutional rights under the Fourteenth Amendment were violated when (1) Defendant Bennett deprived him of due process at his May 30, 1990 disciplinary hearing; (2) Defendant Kihl deprived him of due process at his June 5, 1991 disciplinary hearing; (3) Defendant Selsky affirmed the dispositions of both hearings; and (4) Defendant Kelly failed to intervene in his case after Plaintiff wrote Kelly a letter arguing against the charges placed against him as a result of the disturbance of May 26, 1990. Complaint, filed July 17, 1993 (Docket Item No. 1), ¶¶ 14, 17, 24, 28, 29, 30.

■ To state a § 1983 claim, a plaintiff must demonstrate that he possessed a protected liberty or property interest, and that he was deprived of that interest without due process, *Bedoya v. Coughlin,* 91 F.3d 349, 351–52 (2d Cir.1996), and *Frazier v. Coughlin,* 81 F.3d 313, 316 (2d Cir.1996). The burden is on the plaintiff to demonstrate that a protected liberty interest existed and was infringed upon. *Frazier, supra,* at 317. Therefore, before addressing Plaintiff's claims regarding Defendants' conduct, the court must first determine whether Plaintiff can establish a protected liberty interest as, if Plaintiff has not established such an interest, his cause of action must be dismissed regardless of whether Defendants failed to act in accordance with federally required procedures. *See Frazier, supra,* at 317–318. Such protected liberty interests are "generally limited to freedom from restraint." *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995).

■ In *Sandin,* the Supreme Court created a new standard for determining the existence of a protected liberty interest in cases involving due process claims arising from prison disciplinary procedures. According to *Sandin,* in the administration of prison discipline, a liberty interest protected under the Due Process Clause will generally arise only where, as a punishment for alleged misconduct, a prisoner is to be involuntarily placed in confinement which is " 'qualitatively different' from the punishment characteristically suffered by a person convicted of a crime and results in 'stigmatizing consequences.' " *Sandin, supra,* at 479 n. 4, 115 S.Ct. 2293 (quoting *Vitek v. Jones,* 445 U.S. 480, 493–94, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980)). For a liberty interest to arise under state law sufficient to invoke the protections of the Due Process Clause, a prisoner must establish both that the confinement or restraint creates an "atypical and significant hardship" as established in *Sandin, supra,* at 484, 115 S.Ct. 2293, and that the state has granted its inmates, by regulation or by statute, a protected liberty interest in remaining free from that confinement or restraint.[4] *Frazier, supra,* at 317.

4. Although the meaning of "significant" under the *Sandin* analysis is not further defined, the

■ In the present case, it is clear that the state regulations which govern Plaintiff's disciplinary hearings restrict Defendants' right to impose a disciplinary sentence on Plaintiff, as such a sentence may only be imposed upon an adverse disposition at a hearing conducted in accordance with the regulations.[5] Accordingly, because they circumscribe Defendants' discretion to impose punishment, these regulations create a protected liberty interest in remaining free from disciplinary confinement. *See Branham v. Meachum*, 77 F.3d 626, 629 (2d Cir.1996). The state regulations at issue grant to an inmate an interest in remaining free from disciplinary confinement. However, to attach the protections of the Due Process Clause to this interest, *Sandin* also requires an evaluation of whether the conditions of the Plaintiff's disciplinary SHU and long-term keeplock unit confinement "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin, supra*, at 484, 487, 115 S.Ct. 2293.

In *Sandin*, the Court held that a prisoner's liberty interest protected by the Fourteenth Amendment may arise either from the "Due Process Clause of its own force," *Sandin, supra*, 480, or where the restraint "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* Finding as the relevant basis for comparison the conditions and duration of administrative segregation and protective custody existing at the inmate's prison as the form of discretionary confinement to which federal due process requirements established by *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) do not attach, *Sandin, supra*, at 486, 115 S.Ct. 2293, the Court held that the plaintiff's 30 day SHU punishment at issue in that case

did not "work a major disruption in his environment," *id.*, and was "within the range of confinement to be normally expected for one serving an indeterminate term of 30 years to life." *Sandin, supra*, at 487, 115 S.Ct. 2293. In so holding, the Court expressly stated that punishment of incarcerated prisoners for violations of prison rules and regulations "effectuates prison management and prisoner rehabilitative goals." *Sandin, supra*, at 485, 115 S.Ct. 2293. Accordingly, "[d]iscipline by prison officials in response to a wide range of misconduct falls within the expected parameters of the sentence impose by a court of law." *Id.* It is therefore only where the prisoner's conditions of disciplinary confinement become an "atypical and significant hardship" based on a liberty interest created by state law that federal due process standards must be met. *Sandin* has been held retroactively applicable to prison disciplinary hearings and resultant § 1983 suits such as the instant one, which was pending on the date *Sandin* was decided. *Zamakshari v. Dvoskin*, 899 F.Supp. 1097, 1105 (S.D.N.Y. 1995); *Uzzell v. Scully*, 893 F.Supp. 259, 263 (S.D.N.Y.1995).

■ *Miller v. Selsky*, 111 F.3d 7, 9 (2d Cir.1997), held that while *Sandin* did not create a *per se* rule that disciplinary confinement may never implicate a liberty interest, where a prisoner fails to show the conditions to which he was subjected were "atypical and significant," summary judgment may nevertheless be granted. *Husbands v. McClellan*, 990 F.Supp. 214, 217 (W.D.N.Y. 1998) (dismissing plaintiff's Fourteenth Amendment due process claim where plaintiff failed to show challenged SHU conditions met *Sandin's* requirements for relief under the Fourteenth Amendment). In determining whether a prisoner has a liberty interest in remaining free from segregated confine-

---

court is aided by the Second Circuit's decision in *Frazier, supra,* in which the court stated that the plaintiff must show that the "conditions of his confinement in the SHU were dramatically different from the basic conditions of [his] indeterminate sentence." *Frazier, supra,* at 317 (quoting *Sandin, supra* at 485, 115 S.Ct. 2293).

**5.** Title 7 of the New York Official Compilation of Codes, Rules, Regulations, §§ 253, 254 *et seq.* contain procedural regulations for prison disci-

plinary hearings. (McKinney 1997). As neither Plaintiff nor Defendants have objected to this court's previous holding that the state regulations at issue narrowly restrict Defendants' right to impose a disciplinary sentence on Plaintiff and to keep Plaintiff in SHU and in cell confinement, *see Wright, supra,* 93–CV–601S(F) at 13, and the Second Circuit did not address the issue, *see Wright v. Coughlin,* 132 F.3d 133 (2d Cir.1998), the court's holding is adopted here.

ment, courts are required to make factual findings with respect to the conditions of such confinement at issue in each case. *Wright, supra*, at 137; *Sealey v. Giltner*, 116 F.3d 47, 52 (2d Cir.1997); *Brooks, supra*, at 49; *Miller, supra*, at 8–9.[6]

In applying *Sandin*, several factors are to be used in determining whether the particular restrictions imposed on the inmate are atypical and significant, including: (1) the effect of the segregation on the length of the plaintiff's prison confinement; (2) the extent to which the conditions at issue differ from other routine prison conditions; and (3) the duration of the inmate's disciplinary confinement compared to the potential duration a prisoner may experience while in discretionary confinement. *Wright, supra*, at 136.

### A. *Effect On Length of Prison Confinement*

Here, Plaintiff's temporary loss of good time credits resulting from Bennedict's disciplinary sentence did not affect the length of his prison confinement, and therefore did not deprive him of a liberty interest. *See* Memorandum of Law in Further Support of Defendants' Motion for Summary Judgment, filed May 22, 1998 (Docket Item No. 60), at 5. Where an inmate's good time credits are completely restored after a successful administrative appeal and before their loss could have any effect on the duration of the

inmate's sentence, no liberty interest arises. *See Sandin, supra*, at 486–87, 115 S.Ct. 2293; *Black v. Selsky*, 15 F.Supp.2d 311, 316 (W.D.N.Y.1998); *Husbands, supra*, at 217; *Cespedes v. Coughlin*, 956 F.Supp. 454, 472–75 (S.D.N.Y.1997). In the present case, the first hearing determination that Plaintiff should lose 180 days of good time credit was nullified and expunged from his record as a result of the state court Article 78 proceeding and was not imposed. *See* Exhibit 2 to Plaintiff's Cross–Motion. Therefore, Plaintiff's disciplinary confinement did not affect the length of his sentence and no liberty interest attaches on that basis.

### B. *Comparison to General Prison Conditions*

A § 1983 plaintiff alleging that disciplinary confinement deprived him of a liberty interest must show that the "conditions of his confinement in the SHU were dramatically different from the basic conditions of [his] indeterminate sentence." *Frazier, supra*, at 317 (quoting *Sandin, supra* at 485, 115 S.Ct. 2293). In assessing whether an inmate subjected to disciplinary confinement was deprived of a protected liberty interest, the Court in *Sandin* compared inmates in the SHU for disciplinary purposes to inmates in both the general inmate population, and administrative segregation and protective custody.[7] *See Sandin, supra*, at 485–86, 115 S.Ct. 2293.

---

6. *Brooks, supra*, is similar to the instant case as there plaintiff challenged the district court's dismissal, on summary judgment, of two claims alleging that defendants interfered with plaintiff's due process rights in a prison disciplinary hearing. *Brooks, supra*, at 48. The dismissal was based on a finding that prisoners in New York state have no liberty interest in avoiding disciplinary confinement and, as such, confinement in SHU could not constitute an "atypical and significant hardship." *Id.* The Second Circuit reversed, holding that before determining that confinement in SHU did not impose an "atypical and significant hardship" the state must establish, without relying solely on relevant Department of Correctional Services ("DOCS") regulations and directives, that the actual conditions of confinement in the SHU at issue do not differ significantly from the actual conditions of confinement in the relevant general prison population. *Id.*, at 49.

7. While some courts have found that the relevant comparison under *Sandin* is between the specific

deprivations imposed on the plaintiff and the deprivations imposed in the non-disciplinary confinement area of prisons in the entire state, neither the Supreme Court in *Sandin* nor the Second Circuit has required such a basis of comparison, relying instead on a comparison between disciplinary and non-disciplinary confinement conditions within the plaintiff's institution. *See Sandin, supra*, at 485, 115 S.Ct. 2293 (comparing plaintiff's deprivations in SHU with those of the general prison population within the Halawa Correctional facility where plaintiff was housed when the challenged disciplinary confinement was imposed); *Brooks, supra*, at 48 (district court erred in not comparing conditions of disciplinary confinement with those of administrative confinement or the "prison at large"); *Frazier, supra*, at 317 (it is the inmate's burden to show that the conditions of confinement in SHU are dramatically different from the basic conditions of his indeterminate sentence). *Contra Wagner v. Hanks*, 128 F.3d 1173, 1175 (7th Cir.1997) (relevant comparison to "most restrictive confine-

## (1) Plaintiff's asserted claims of atypicality

In this case, Plaintiff has asserted grounds which he contends establish the requisite degree of atypicality between his SHU confinement and the conditions of general confinement. Specifically, Plaintiff has alleged a liberty interest based on (1) inadequate food, recreation, and daily living conditions in SHU cells, (2) loss of telephone, commissary, and programming privileges, (3) denial of education and access to religious services, and (4) inadequate library resources and legal assistance. The court finds that none of these alleged differences is sufficient as a matter of law or Plaintiff has failed to raise a genuine issue of material fact as to these alleged differences.

Defendants have submitted the affidavit of Anthony J. Annucci, Deputy Commissioner and Counsel for the New York State Department of Correctional Services ("Annucci Affidavit"), in which Deputy Commissioner Annucci, based on relevant DOCS directives, records, regulations and policy guidelines, and relying on his own personal knowledge, describes in detail why the conditions of confinement in SHU to which Plaintiff was subjected did not differ markedly from the conditions of confinement in the general prison population. Affidavit of Anthony J. Annucci, filed February 18, 1998 (Docket Item No. 49), ¶¶ 11, 12, 14, 15, 16, 17, 18, 19. In his affidavit, the Deputy Commissioner stated

> Inmates placed in SHU for any reason except protective custody under [N.Y.Comp.Codes R. & Regs. tit. 7,] § 301.5 are allowed out of their cells for one hour of outdoor exercise daily ... a minimum of two showers a week ... and unlimited legal visits and one non-legal visit per week. All inmates placed in SHU may be provided with counseling services on a daily basis ... are given the opportunity to participate in a cell study program

to the extent possible based on the inmate's overall behavioral adjustment ... are provided with daily access to sick call ... and are permitted books and periodicals from the facility's law library.

Annucci Affidavit, ¶ 11.

Defendants have also provided the Affirmation of Walter R. Kelly, Superintendent of Attica, reiterating these conditions and adding that prisoners in SHU are able to send and receive mail, and receive the same meals as the general inmate population. Affidavit of Walter R. Kelly, filed August 15, 1995 (Docket Item No. 36) ("Kelly Affirmation"), ¶ 5.

In his Affidavit, dated September 21, 1995, Plaintiff claims that during his confinement in disciplinary SHU he was "forced to an empty cell without personal belongings [sic] ... without any food except that provided by his calloused [sic] custodians." Plaintiff's Affidavit, ¶ 7.[8] Plaintiff later claimed, in his Memorandum dated September 21, 1995, that the meals served to inmates in SHU pose a significant hardship as they consist of "bland, unwholesome, and cold meals" which are "frequently contaminated by bacteria from sitting out in unsanitary conditions." Plaintiff's Memorandum, ¶ 52.[9] In contrast, according to Plaintiff, the meals in the general population are hot, and the inmates have a choice of food which may be supplemented by food obtained from the commissary. *Id.*, ¶ 53.

Plaintiff stated that on several occasions while he was incarcerated in disciplinary SHU he suffered severe diarrhea and nausea immediately after eating. Plaintiff's Memorandum, ¶ 52. According to Plaintiff, his requests for medicine to treat these ailments were "laughed at." *Id.* Finally, Plaintiff claimed that SHU corrections officers tampered with his food during his incarceration

---

ment found in any facility in entire state"); *McClary v. Kelly*, 4 F.Supp.2d 195, 201 (W.D.N.Y.1998) (relevant comparison to maximum security facilities in entire state).

8. Plaintiff also listed denials of personal clothing in winter, work, education, "programming," telephone, packages, conjugal visits, commissary, and recreation. *Id.*

9. Although referred to as a "Memorandum," the document is sworn to and thus, as to the factual statements it contains, should be considered as an affidavit for purposes of Fed.R.Civ.P. 56(e). *See also* 28 U.S.C. § 1746 (unsworn statements made under penalties of perjury considered as the equivalent of sworn affidavits where required).

in disciplinary SHU, resulting in psychological and physical problems. Plaintiff's Memorandum, ¶ 32.

In his Affidavit, Plaintiff claims that while confined in disciplinary SHU and long-term keeplock at Attica prison he was denied recreation. Plaintiff's Affidavit, ¶ 7. However, in his Memorandum, Plaintiff stated that inmates in SHU are permitted one hour per day for recreation, and claimed that SHU inmates do not have a suitable recreation area in comparison to the general prison population. Plaintiff's Memorandum, ¶ 56. According to Plaintiff, the recreation room contains no equipment, games, or recreational items, and there are no other inmates to play games with. Id. With regard to the long-term keeplock confinement area, Plaintiff claims that as a result of alleged violence occurring in that area, he was required to forego the allotted recreation period. Plaintiff's Memorandum, ¶ 12.

In contrast, Plaintiff states that inmates in the general population have three separate times during the day designated for recreation, and use the prison's yards or gym for this purpose. The yards include a weight lifting area, handball court, basketball court, and other recreational items. Id. at 57.

As to the daily living conditions, Plaintiff asserts that in disciplinary confinement inmates are denied personal property, as they are only permitted to possess certain designated items. Plaintiff's Memorandum, ¶ 59. In his Affidavit, Plaintiff stated that while confined in disciplinary SHU he was "without personal belongings but five books," and that he was deprived of personal clothing "even in winter." Plaintiff's Affidavit, ¶ 7. In contrast, according to Plaintiff, inmates in administrative or protective confinement are permitted to keep all or part of their personal property, including personal clothing, bedding, reading and writing material, cooking equipment, and bowls and food from the commissary. Plaintiff's Memorandum, ¶ 60.

Plaintiff also maintains that corrections officers assigned to the SHU area would frequently leave the windows open during the winter, requiring Plaintiff to wear all of his designated clothing to bed each night. Plaintiff's Memorandum, ¶ 59.

Plaintiff claims that while in disciplinary SHU and long-term keeplock, his cell was "the situs of outright hardship, hostility, suffering, stress, hunger, and unsanitary conditions," including the presence of mice and roaches, harassment and hostility from SHU corrections officers, the loss of telephone, commissary, programming, and package privileges, and the denial of conjugal visits. Plaintiff's Memorandum, ¶ 27; Plaintiff's Affidavit, ¶ 7. Plaintiff claims that as a result of these conditions, he was forced to seek treatment for "obvious physical, as well as psychological infirmities," Plaintiff's Memorandum, ¶ 11, and "serious psychological disorders," Plaintiff's Memorandum, ¶ 32, resulting from his SHU confinement. Plaintiff's Affidavit, ¶ 6.

Plaintiff also claims in his Affidavit that his college programming was "irreparably disrupted, and, plaintiff did not graduate because he spent almost one year locked-down without any access to programming whatsoever." Plaintiff's Affidavit, ¶ 4; Plaintiff's Memorandum, ¶ 25. Plaintiff has also alleged denial of access to religious services "of which he was devotely [sic] committed to." Plaintiff's Memorandum, ¶¶ 25, 63.

While incarcerated in disciplinary SHU and long-term keeplock, Plaintiff claims that he had no access to the legal assistant who was participating in his criminal appeal, resulting in the affirmance of his criminal appeal. Plaintiff's Affidavit, ¶ 4. Plaintiff also claims that the law library and general library services offered at the prison were not adequate. Plaintiff's Memorandum, ¶ 41. Specifically, Plaintiff alleges that inmates in SHU are permitted only two legal books every other day, and that he was denied full access to legal assistance as he was limited in the amount of writing paper, functioning pens, and carbon papers he received. Id.

According to Plaintiff, the general library consists of "outdated, torn, mutilated and wholly undesirable" books which "are of little, if any value to those inmates who care to utilize this service." Id., ¶¶ 46, 47. As to the self study program, Plaintiff claims that SHU inmates are forced to wait as long as weeks before they receive the requested books, and

in some cases the wrong materials are brought to the inmate. *Id.,* ¶ 48.

Plaintiff's assertions as to atypicality based on the conditions in disciplinary SHU as compared to general prison conditions fail to raise a genuine issue of fact, as Plaintiff has failed to demonstrate that he suffered an atypical and significant hardship in relation to the ordinary incidents of prison life under established precedent. Further, as will be discussed, Plaintiff has also failed to provide sufficient probative evidence under Fed. R.Civ.P. 56(e) necessary to oppose Defendants' Motion for Summary Judgment.

**(2) Plaintiff's assertions of atypicality are insufficient as a matter of law**

Plaintiff's claims of atypical conditions regarding (1) recreational opportunities, (2) daily living conditions, lack of access to personal property, and conjugal visits, (3) telephone, package, and commissary privileges, (4) education, programming, and access to religious services, and (5) legal assistance fail to establish a valid basis upon which *Sandin*'s requirements can be satisfied.

■ Lawful imprisonment necessarily makes unavailable many rights and privileges of the ordinary citizen. *Wolff v. McDonnell,* 418 U.S. 539, 555, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *Arce v. Walker,* 139 F.3d 329, 333 (2d Cir.1998). The Due Process Clause does not protect against "every change in the conditions of confinement having a substantial adverse impact" on inmates, *Sandin, supra,* at 478, 115 S.Ct. 2293, if those changes are "within the normal limits or range of custody which the conviction has authorized the State to impose." *Arce, supra,* at 333. In the present case, based on the supposed differences between the conditions in Plaintiff's SHU and those of the general prison population, Plaintiff has failed to show that the conditions of confinement in SHU were dramatically different from the basic conditions of his indeterminate sentence, *Frazier, supra,* at 317.

**a. Recreation**

■ Plaintiff's allegations as to atypicality based on a denial of exercise privileges, even if true, fail to establish a valid basis upon which *Sandin*'s requirements can be satisfied. While serving his five and one half month sentence in SHU, Plaintiff was permitted one hour per day for recreation compared to the three hours daily allotted non-SHU prisoners. Plaintiff's Memorandum, ¶ 56. Courts have held that a claim of temporary denial of exercise privileges is insufficient to establish atypicality. *See Sandin, supra; Arce, supra,* at 336; *Frazier, supra,* at 317. Although Plaintiff attempts to raise a genuine issue of fact by describing the conditions of the Attica SHU recreation room, Plaintiff's Memorandum, ¶ 56,[10] based on the relevant caselaw, holding that a denial of recreation is insufficient to establish a federally protected liberty interest, Plaintiff's allegations of the inadequate conditions or quality of the recreation area provided to an SHU inmate, even if true, cannot be the basis for finding a protected liberty interest.[11]

---

10. Plaintiff describes the recreation area as a 12' × 20' high walled room located on the roof of the SHU building with an open grated ceiling, and without table, chair, games, balls, or television. Plaintiff's Memorandum, ¶ 56. By contrast, non-SHU prisoners enjoy access to a variety of recreational accoutrements. *Id.,* ¶ 57.

11. *Compare Lee v. Coughlin,* 26 F.Supp.2d 615, 632 (S.D.N.Y.1998). In *Lee,* the court found the plaintiff's confinement in disciplinary SHU for a period of 376 days at the Sing Sing and Southport prison facilities to be an atypical and significant hardship. The court examined the amount of time spent in lockdown, access to prison programs, restrictions on personal belongings, exercise, shackling, and limited visitation in distinguishing the plaintiff's SHU confinement from that of the plaintiff in *Sandin,* stating that in New York, year-long sentences in disciplinary SHU "in isolation, even while exercising, with limited visits, and virtually no personal belongings" demonstrated a "dramatic departure" from ordinary prison life. *Id.* at 635. With regard to exercise, the court noted that "conditions as Southport are even harsher than in SHU at other prison facilities, in that prisoners . . . exercise alone, with restraints, and in 'cages,' as opposed to open spaces." *Id.* at 632. *Lee* is distinguishable from the instant matter, however, based on the length and location of Plaintiff's SHU confinement. Notably, Plaintiff served approximately 165 days in disciplinary SHU at the Attica prison facility, in comparison to the 376 days in disciplinary SHU at the Sing Sing and Southport facilities served by the plaintiff in *Lee.*

### b. Daily living conditions in disciplinary SHU cell and long-term keeplock

While Plaintiff attempts to assert in his Memorandum that he was deprived of all of his personal property, a close reading of the Memorandum indicates that Plaintiff was permitted to keep a portion of his personal property while in disciplinary confinement. Plaintiff states that he was permitted his own undergarments, socks, shirts, and winter coat. Plaintiff's Memorandum, ¶ 59. According to Plaintiff, non-SHU inmates retain rights to possess personal bedding, reading and writing material, cooking equipment including a hot pot and bowl, as well as commissary food, a tape player, radio, reading light, water, books, and musical instruments. Plaintiff's Memorandum, ¶ 60.

As stated, lawful imprisonment necessarily makes unavailable many rights and privileges of the ordinary citizen, *Wolff, supra,* at 555, 94 S.Ct. 2963, and the inmate's right to personal property is one such right. *See Spaight v. Cinchon,* 1998 WL 167297, *5 (N.D.N.Y.1998) ("even assuming that the conditions of confinement were more restrictive in SHU and that plaintiff did not have all of his personal property," administrative confinement to which plaintiff was subjected was not atypical and significant under *Sandin.*) As Plaintiff was permitted to keep a portion of his personal property while confined in SHU, and as the asserted restrictions on possession of other types of personal property are within the range of the normal and typical restrictions on prisoners, Plaintiff's general assertion of deprivation of his personal property, *e.g.,* personal cooking pot, is insufficient to meet his burden of raising a genuine issue of material fact on this ground.

Additionally, Plaintiff's claim asserting atypicality on the basis of a denial of conjugal visits is also insufficient on its face, as inmates do not have a protected liberty interest in receiving conjugal visits. *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). *See also Hernandez v. Coughlin,* 18 F.3d 133, 136–38 (2d Cir.), *cert. denied,* 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994). Thus, no finding of an atypical or serious difference between the specific SHU discipline conditions at issue here and general prison life at Attica can be predicated on this alleged deprivation.

### c. Telephone, package, and commissary privileges

Plaintiff claims that he was temporarily denied telephone, package, and commissary privileges while incarcerated in disciplinary SHU and long-term keeplock. Plaintiff's Memorandum, ¶ 25. Courts have held that the denial of such privileges does not represent the type of deprivation which could reasonably be viewed as imposing an atypical and significant hardship on the inmate. *Frazier, supra,* at 317 (telephone, package, commissary, and recreation); *Husbands, supra,* at 217 (telephone, package, commissary, and recreation); *Black, supra,* at 315 (telephone, package, and commissary). Plaintiff's claim of atypicality based on the denial of telephone, commissary, and package privileges is therefore an insufficient ground upon which to raise a genuine issue of material fact as to the presence of an atypical and significant hardship.

### d. Education, programming, and religious services

In his Affidavit, Plaintiff claims that his college programming was "irreparably disrupted, and, plaintiff did not graduate because he spent almost one year locked down without any access to programming whatsoever." Plaintiff's Affidavit, ¶ 4; Plaintiff's Memorandum, ¶ 25. Although N.Y.Correct.Law § 136 (McKinney 1987 & Supp. 1998) requires that each inmate be provided a program of education, as the court noted in *Giano v. Cuomo,* 1998 WL 760262, *3–4 (N.D.N.Y.1998), the statute does not specify any detailed educational requirements and does not, in itself, confer a liberty interest in a full-time education. *Giano, supra,* at *3.

Prison officials need not provide an educational program tailored to the specific needs and circumstances of the inmate. *Giano, supra,* at *3 ("neither § 136 nor DOCS policies require a prison to provide an inmate with specialized educational programs"); *Clarkson v. Coughlin,* 898 F.Supp. 1019, 1041 (S.D.N.Y.1995) ("only the provision of no ed-

ucation at all or education that was wholly unsuited to the goals of a particular inmate's socialization and rehabilitation trigger due process protections" under § 136); *Jones v. Grunewarld*, 644 F.Supp. 256, 259 (S.D.N.Y. 1986) (§ 136 does not provide an inmate a protected property interest in a scholarship); *Lane v. Reid*, 575 F.Supp. 37, 39 (S.D.N.Y. 1983) (holding that § 136 does not provide inmate a protected property interest in full-time program of education).[12]

Federal courts have, moreover, consistently found that prisoners have no protected liberty interests in prison vocational, rehabilitation and educational programs based on the Fourteenth Amendment. *Moody v. Daggett*, 429 U.S. 78, 88 n. 9, 97 S.Ct. 274, 50 L.Ed.2d 236 (1976) (holding that state actions which carry adverse consequences for prison inmates do not automatically activate federal due process considerations, and dismissing plaintiff's claim that his prison classification constituted a due process violation because it disqualified him from institutional rehabilitation programs); *Lee v. Governor of State of New York*, 87 F.3d 55, 58 (2d Cir.1996) (rule rendering inmates ineligible for temporary release program does not work "atypical and significant hardship" required under *Sandin* in order to establish liberty interest); *Sutherland v. McCall*, 709 F.2d 730, 733 (D.C.Cir.1983) (fact that plaintiff was rendered ineligible for prison rehabilitative programs pending parole revocation hearing did not rise to level of violation of constitutionally protected due process interest); *West v. Keane*, 1997 WL 266977, *4 (S.D.N.Y.1997) (noting that "in the scheme of the inmates' regulated prison life, the cancellation of a specific rehabilitative or vocational program does not cause the sort of 'major disruption' of Plaintiff's environment that rises to the level of a due process violation"); *Castronova v. United States*, 1995 WL 604327 (W.D.N.Y. Aug.29, 1995) (the presence of a parole detainer in a prisoner's file, which foreclosed prisoner's participation

in rehabilitative and educational programs within the state prison, did not give rise to a federal constitutional due process claim because as a general rule a prisoner does not hold a protected interest in loss of such programs). Thus, withdrawal of educational programs, as a basis of atypical conditions under *Sandin*, is insufficient as a matter of law and summary judgment cannot be avoided on this ground.

Plaintiff's claim of atypicality alleging a denial of access to religious services, Plaintiff's Memorandum, ¶ 25, is not a sufficient basis upon which to raise a genuine issue of material fact. A claim of temporary denial of access to religious services incident to the administration of prison discipline has been held insufficient to support a finding of atypicality. *Arce, supra*, at 336. Accordingly, Plaintiff's assertions of atypicality based on the denial of prison rehabilitative programming, education, and access to religious services fail to raise a genuine issue of material fact.

### e. Legal assistance

Plaintiff also claims that he was denied access to the prison law library as a factor demonstrating the existence of atypical conditions. Plaintiff's Memorandum, ¶¶ 40–43. Although the Constitution guarantees prisoners meaningful access to courts, and, for *pro se* plaintiffs, reasonable access to a law library, *see Bounds v. Smith*, 430 U.S. 817, 821, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977); *Morello v. James*, 810 F.2d 344, 346–47 (2d Cir.1987); *Ramirez v. Holmes*, 921 F.Supp. 204, 206 (S.D.N.Y.1996), such right to access a library is not unlimited, and prison officials may impose reasonable restrictions on the use of prison law libraries. *Harris v. Keane*, 962 F.Supp. 397, 404–05 (S.D.N.Y.1997) (citing *Morello, supra*, at 347).

Furthermore, several courts have refused to find atypical conditions where a prison inmate's claim of atypicality is based in part

---

12. In the present case, Plaintiff's general assertion that he "was going to college and did not graduate on account of the charges against him," Plaintiff's Memorandum, ¶ 34, is unspecific. Plaintiff has failed to specifically provide facts showing how a temporary sentence in SHU resulted in the denial of his college degree or that he was even actually so enrolled. Absent such a specific factual showing, the statement is conclusory and, therefore, insufficient to raise a triable issue of fact upon which atypicality may be predicated.

on a denial of access to the prison law library. *See, e.g., Nogueras v. Coughlin,* 1996 WL 487951, *5 (S.D.N.Y.1996); *Luis v. Coughlin,* 935 F.Supp. 218, 221 (W.D.N.Y. 1996); *Christianson v. Clarke,* 932 F.Supp. 1178, 1182–83 (D.Neb.1996); *Rosario v. Selsky,* 1995 WL 764178, *5 (S.D.N.Y.1995); *Carter v. Carriero,* 905 F.Supp. 99, 103 (W.D.N.Y.1995).

In the present case, Plaintiff claims that he was denied access to the prison law library during his incarceration in disciplinary SHU and long-term keeplock, resulting in affirmance of his criminal appeal, and his inability to file a supplemental brief in support of a new trial. Plaintiff's Affidavit, ¶ 4. However, Plaintiff's claim is contradicted by the statement in his Memorandum that "prisoners in SHU are permitted ... two legal books every other day." Plaintiff's Memorandum, ¶ 41.

In addition, Plaintiff stated that "had Plaintiff ... not solicited the Wyoming County Legal Aid Services for their assistance in obtaining redress from the apparent errors committed by [the] current Defendants ... Plaintiff would have served a greater, if not the entire portion of his 365 day sentence," Plaintiff's Memorandum, ¶ 43, suggesting that Plaintiff nevertheless had access to legal assistance during his incarceration in disciplinary SHU and long-term keeplock. Given the undisputed fact that Plaintiff had outside legal assistance in connection with the two state proceedings attacking his disciplinary confinement, his generalized assertions of lack of access to legal assistance ring hollow. Plaintiff also claims that he was limited in the amount of writing paper, pens, and carbon papers he received. Plaintiff's Memorandum, 41. However, Plaintiff has presented no specific evidence concerning the extent of these alleged deprivations.

■ In alleging atypicality on these grounds, Plaintiff has made no showing that inmates in non-disciplinary confinement, *i.e.,* general prison population and administrative SHU confinement, were not also subject to such limitations. "Restrictions on ... access to law libraries apply to all inmates confined to SHU regardless of the reason that they have been placed there." *Nogueras, supra,*

at *5. As Plaintiff has failed to raise a genuine issue of material fact as to whether the limited access to legal materials was a condition dramatically different from the basic conditions of his indeterminate sentence, *Frazier, supra,* at 317, a finding that Plaintiff suffered an atypical and significant hardship while confined in disciplinary SHU and long-term keeplock is unwarranted based on such limitations. *See, e.g., Carter, supra,* at 103 (Plaintiff's claims of atypicality based on law library access, educational opportunities, visitation, telephone use, personal property, employment eligibility, work release, and furloughs insufficient, as these restrictions apply to all SHU confinement, whether disciplinary or non-disciplinary). Moreover, Plaintiff's own statements in the Affidavit and Memorandum, plaintiff fail to raise a genuine issue of material fact as to whether the limitations placed on his access to the law library and legal materials as a basis for finding serious atypical conditions were imposed upon him while in SHU. Therefore, such limitations as may have occurred during Plaintiff's SHU and long-term keeplock sentences cannot be the predicate for finding his challenged confinement to be an atypical and significant hardship.

Plaintiff's claims of atypicality based on (1) recreation, (2) daily living conditions in SHU cells and long-term keeplock including loss of personal items and conjugal relations, (3) telephone, package, and commissary privileges, (4) education, programming, and access to religious services, and (5) access to the law library and legal materials fail to present any sufficient basis upon which to show the existence of serious atypical differences in confinement conditions as a matter of law. The alleged disparate conditions upon which Plaintiff relies to meet *Sandin*'s requirement relate to aspects of confinement involving no federally recognized right of access under the Due Process Clause. When compared to conditions available to non-disciplinary SHU inmates at Attica as described by Plaintiff, the deprivations at issue here do not impose so severe a hardship as to invoke federal due process requirements prior to

imposition of the SHU punishment at issue.[13] In the alternative, Plaintiff's claims are insufficient to raise a genuine issue of material fact as Plaintiff has failed to meet his burden in opposing a motion for summary judgment.

### (3) Plaintiff has failed to submit evidence sufficient to avoid summary judgment.

Fed.R.Civ.P. 56(e) requires that a party opposing a motion for summary judgment "not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth *specific facts* showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." Fed.R.Civ.P. 56(e) (emphasis added). As the Supreme Court stated in *Celotex*, "[r]ule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex, supra,* at 324, 106 S.Ct. 2548. Summary judgment must be granted if a *pro se* plaintiff fails to make a sufficient showing of concrete evidence on an essential element of the case for which he would bear the burden of proof at trial. *Anderson, supra,* at 256, 106 S.Ct. 2505; *Jermosen, supra,* at *3.

As discussed, under *Sandin*, Plaintiff has the burden of establishing that the conditions of the Attica SHU and long-term keeplock area imposed atypical and significant hardship on him in relation to the ordinary incidents of prison life. *Sandin, supra,* 480. Plaintiff's generalized assertions of atypicality based on the differences in (1) food, (2) recreation, (3) daily living conditions in disciplinary SHU cells and long-term keeplock, and (4) library resources compared to non-SHU inmates fail to raise a genuine issue of material fact. As such, they are insufficient to require a trial to determine whether the *Sandin* standards have been met.

### a. Food

Plaintiff's allegations of poor nutritional content, contamination by bacteria, physical illness, and food tampering consist of generalized, conclusory allegations and are therefore insufficient to successfully oppose Defendants' motion for summary judgment under Fed.R.Civ.P. 56(e) and *Anderson*.[14]

---

**13.** Indeed, in comparison to the conditions experienced by inmates confined to the general population in many prisons across the nation, Plaintiff's claims of atypicality fall short of alleging the degree of significant hardship compared to daily prison life as required by *Sandin*. One writer recently described the conditions in America's prisons as follows:

> At least forty-five state prison systems are now operating at or above their intended capacity. In twenty-two states prisons are operating under court-ordered population caps. In fifteen states prison conditions are being monitored by the courts. Life in the aging, overcrowded prisons operated by many state agencies is dangerous and degrading. Most of the 34,000 state inmates currently held in the nation's jails for lack of available prison cells live in conditions that are even worse.

Eric Schlosser, *The Prison Industrial Complex*, THE ATLANTIC MONTHLY, December 1998, at 51, 64. Conditions in many New York state prison facilities, Attica included, are no better. *See* Michael Beebe and Dan Herbeck, *Inmate Crisis Shackles Stale 25 years after Attica, the Numbers Soar*, THE BUFFALO NEWS, September 8, 1996, at A1 (pointing to the increased use of double and triple bunking to cope with overcrowding); *5 More Attica, N.Y. Guards Hurt*, ASSOCIATED PRESS, August 4, 1998, *available in* 1998 WL 6703553 (reporting facility-wide lockdown in fourth day and extra restraints for prisoners based on injuries to corrections officers); *Attica Cells Searched for Weapons After Attacks*, THE ARIZONA REPUBLIC, August 3, 1998, at A3 (reporting seizure of weapons by prison officials following cell searches during facility-wide lockdown); Debra Jo Immergut, *Inmate Quality of Life Can Be a Hard Cell*, NEW YORK, February 17, 1997, at 15 (confirming existence of unappealing food, crowded cells, and clogged toilets in local New York City jails).

**14.** Although nothing in *Sandin* suggests that a plaintiff must sustain an Eighth Amendment violation in order to establish atypicality, *see McClary, supra,* at 209 n. 9, the court notes with regard to Plaintiff's claims of atypicality based on the food served in disciplinary SHU and long-term keeplock, Plaintiff points to no evidence that he was either deprived of food or a medically prescribed diet, both of which have been recognized as sufficient to state a claim under § 1983. *See Labounty v. Gomez,* 1998 WL 214774, *2 (S.D.N.Y.1998) (failure to provide a medically prescribed diet can state a claim for

Plaintiff's claims in each instance are unsupported by the affidavits of other inmates or other probative evidence. *See, e.g., Brown, supra,* at 670 (summary judgment granted, as plaintiff inmate failed to submit affidavits of other inmates, or medical evidence of health problems, plaintiff failed to raise genuine issue of material fact as to alleged contamination of drinking water at prison); *Saulter v. Hanslmaier,* 1997 WL 177887, *3 (S.D.N.Y.1997) (granting defendant's motion for summary judgment where plaintiff inmate failed to set forth specific facts regarding claim that dormitory housed "sick and infested" inmates, and therefore failed to assert protected liberty interest). As stated, Plaintiff must produce concrete evidence from which a reasonable juror could render a verdict in his favor, stating specific facts, and not simply legal or constitutional conclusions. *Anderson, supra,* at 256, 106 S.Ct. 2505; *Guzman v. Kelly,* 1996 WL 291985, *3; *Jermosen, supra,* at *3.

Here, Plaintiff's generalized personal assertions lack any particularity as to date, time, nature of the food in question, records of complaints, the characterization of unwholesomeness, or other minimal indicia of probativeness. This obvious lack of even the slightest degree of particularity renders the proferred evidence unspecific and therefore insufficient to avoid summary judgment. Fed.R.Civ.P. 56(e); *Celotex, supra,* at 324, 106 S.Ct. 2548. Plaintiff's bald assertions, if allowed, would be tantamount to reasserting generalized allegations in the Complaint to defeat summary judgment contrary to Rule 56(e) ("adverse party may not rest upon the mere allegations ... of the adverse party's pleading"). As Plaintiff has failed to raise a genuine issue of material fact whether the conditions of his disciplinary SHU confinement were "dramatically different" from the basic conditions of his indeterminate sentence while at Attica on this ground, *Frazier, supra,* at 317, summary judgment is appropriate.

### b. Recreation

Plaintiff's claims of atypicality on the basis of a denial of recreational opportunities in long-term keeplock are also insufficient. *See* Fed.R.Civ.P. 56(e); *Celotex, supra,* at 324, 106 S.Ct. 2548. A close reading of the Plaintiff's Affidavit and Memorandum indicates that Plaintiff was not denied the ability to exercise during his four and one-half month sentence in long-term keeplock as a result of any action by Defendants, rather, he chose to forego the opportunity to do so because of his personal dislike of the conditions available, or the alleged violence occurring in the long-term keeplock unit. Plaintiff's Memorandum, ¶¶ 12, 56–57. In his Memorandum, Plaintiff states only that while incarcerated in long-term keeplock he was "constrained to forego" his one hour recreation period. *Id.,* ¶ 12. Such a generalized and conclusory statement, which fails to allege specific details of incidents of the denial of recreation and exercise or personal involvement by any of the Defendants in alleged deprivation, is insufficient to oppose a motion for summary judgment. In addition, Plaintiff's generalized personal assertions of violence in the long-term keeplock area are, for the same reason, insufficient to raise a genuine issue of material fact relevant to his inadequate recreation contention. Fed.R.Civ.P. 56(e); *Celotex, supra,* at 324, 106 S.Ct. 2548.

### c. Daily living conditions

As to the daily living conditions in the disciplinary SHU cells and long-term keeplock, Plaintiff has not provided affidavits by other SHU inmates or other evidence of such conditions, and has accordingly failed to raise a genuine issue of material fact as to the cell conditions in disciplinary SHU. Fed.R.Civ.P. 56(e); *Celotex, supra,* at 324, 106 S.Ct. 2548. Plaintiff's claim that corrections officers would frequently leave the SHU windows open during the winter, requiring Plaintiff to wear all of his designated clothes to bed each

---

relief under § 1983); *Abdush–Shahid v. Coughlin,* 933 F.Supp. 168, 180 (N.D.N.Y.1996) (noting that denial of medically prescribed diet may constitute an Eighth Amendment violation). *See also Wagner, supra,* at 1174 (noting that disciplinary segregation in maximum security prisons not likely to involve an atypical and significant deprivation of liberty "without scraping up against the Eighth Amendment's prohibition against cruel and unusual punishment.")

night, Plaintiff's Memorandum, ¶¶ 33, 59, is unsupported by the affidavits of other SHU inmates or other admissible evidence of such conditions, and fails to particularize any dates when such action occurred. Again, the absence of any specific evidence to give substance to these general assertions requires summary judgment be granted. Fed. R.Civ.P. 56(e); *Celotex, supra,* at 324, 106 S.Ct. 2548.

Plaintiff's general assertions of infestation of his cell with mice and roaches and harassment and hostility from SHU guards are likewise insufficient. Plaintiff's Memorandum, ¶¶ 27, 32. Although Plaintiff refers in his Affidavit to the need for "psychiatric therapy," Plaintiff's Affidavit, ¶ 6, and in his memorandum to "obvious physical, as well as psychological infirmities," Plaintiff's Memorandum, ¶ 11, and "serious psychological disorders," Plaintiff's Memorandum, ¶ 32, resulting from these conditions, such general assertions also fail to raise a genuine issue of material fact, as Plaintiff has provided no inmate affidavits, grievances, medical treatment records or other corroborative evidence sufficient to render Plaintiff's evidence specific. Such generalized assertions are insufficient to defeat summary judgment. Fed. R.Civ.P. 56(e).

Plaintiff also alleges that violence regularly occurs in the long-term keeplock unit, including fighting which many times involves the use of weapons.[15] Plaintiff's Memorandum, ¶ 11. According to Plaintiff, weaker inmates are forced to engage in perverse acts in the long-term keeplock area. *Id.* Again, Plaintiff provides no information as to specific incidents of violence or "perverse acts" in this area, or any other evidence corroborative of his claim sufficient to meet the requirements of Fed.R.Civ.P. 56(e), and has therefore failed to raise a genuine issue of material fact as to the conditions allegedly occurring in the long-term keeplock recreation area upon which atypicality on this ground may be based.

### d. Library resources

As to Plaintiff's claims regarding the inadequacy of the general library, Plaintiff's Memorandum, ¶¶ 41, 46–47, Plaintiff has failed to demonstrate that the conditions of the general library, including the "outdated, torn, mutilated and wholly undesirable" books, or delay in receiving materials through the self-study program, are confined to SHU inmates and unlike the conditions experienced by the Attica prison population in general. As with Plaintiff's other attempts to create material issues of fact on the issue of atypical conditions in the Attica disciplinary SHU and long-term keeplock, Plaintiff's allegations, while sworn, are conclusory and unspecific. As such, they are insufficient to require a trial to determine whether the *Sandin* standards have been met.

As discussed, in attempting to establish atypicality by comparing the conditions of disciplinary SHU and long-term keeplock with those of the general prison population, Plaintiff has failed to raise a genuine issue of material fact. Plaintiff's claims as to recreation, daily living conditions, possession of personal items, telephone, package, and commissary privileges, education, programming, and religious services, and legal assistance are insufficient to raise a genuine issue of material fact as to atypicality as a matter of law. Furthermore, Plaintiff's claims of atypicality based on the food, recreation, daily living conditions, and library resources are insufficient under Fed.R.Civ.P. 56(e) to oppose Defendants' motion for summary judgment. However, Plaintiff also contends that atypicality exists as the conditions of administrative confinement or protective custody at Attica differ significantly from those of the disciplinary SHU and long-term keeplock area.

### (4) Comparison to administrative and protective custody confinement

According to Defendants, inmates may be placed in SHU as·a result of a disciplinary

---

**15.** Defendants have submitted no statements or other evidence responding to Plaintiff's allegations of violence in this area. However, as the party moving for summary judgment, Defendants need not provide such evidence. As the Supreme Court stated in *Celotex, supra,* there is no express or implied requirement in Fed.R.Civ.P. 56 that the party moving for summary judgment support its motion with affidavits or other similar materials negating the opponent's claim. *Celotex, supra,* at 323, 106 S.Ct. 2548.

hearing imposing confinement in SHU as a penalty, for administrative reasons, for protective custody, as a keeplock admission, or for any other reason. Annucci Affidavit, ¶ 10. Based on the affidavit of Deputy Commissioner Annucci, in New York, disciplinary SHU differs from administrative SHU in only two ways. First, disciplinary SHU inmates must complete a thirty day period of "satisfactory adjustment" before they are eligible for additional privileges, while administrative admittees receive such privileges at the beginning of their confinement in SHU. Second, administrative SHU inmates have their status reviewed every seven days for their first two months of SHU confinement and every thirty days thereafter by a three member committee to ascertain whether further administrative confinement is needed. Annucci Affidavit, ¶ 12. As to recreation, showers, legal and non-legal visits, cell study program, and access to both general and legal library resources, Defendants state there are no differences between administrative SHU confinement and disciplinary SHU confinement. Annucci Affidavit, ¶ 11.

Plaintiff states that while administrative or protective custody SHU inmates receive monthly review for prospective release, disciplinary SHU inmates receive no such review. Plaintiff's Memorandum, ¶ 10. Plaintiff also states that while inmates in administrative SHU and protective custody are allowed to possess personal property, inmates in disciplinary SHU are not permitted to do so. *Id.* Finally, Plaintiff asserts that administrative and protective custody inmates are afforded use of a telephone, while disciplinary SHU inmates are not permitted such use. *Id.* There is no material difference between the parties as to these basic aspects of non-disciplinary and disciplinary SHU confinements.

### a. Availability of periodic review for administrative SHU

As discussed, the Supreme Court in *Sandin* held that a determination of whether a

§ 1983 plaintiff was deprived of a liberty interest should include a comparison between the conditions in disciplinary confinement and those of administrative and protective custody confinement. *Sandin, supra* at 485, 115 S.Ct. 2293. In this case, the Second Circuit directed that such a factual comparison of administrative and disciplinary confinement be conducted on remand, *Wright, supra,* at 137, suggesting that "[a]ccess to periodic confinement reviews ... might differentiate disciplinary from administrative confinement." *Wright, supra,* at 137.[16] However, as Deputy Commissioner Annucci points out, while such periodic review evaluates the need for continued administrative SHU confinement, it does not alter the actual physical conditions of confinement of an administrative SHU inmate. Annucci Affidavit, ¶ 12.

Courts in this circuit have held that the physical conditions in administrative SHU essentially parallel those in disciplinary confinement. *Sher v. Coughlin,* 739 F.2d 77, 79–82 (2d Cir.1984); *Tulloch v. Coughlin,* 1995 WL 780970, *2 (W.D.N.Y.1995). *See also Husbands, supra,* at 218 n. 2 (differences relating to periodic review are "minor exceptions," compared to the essential similarity of administrative and disciplinary confinement); *Jones v. Kelly,* 937 F.Supp. 200, 203 (W.D.N.Y.1996) ("[d]isciplinary segregation in New York mirrors, with insignificant exceptions, the conditions of administrative segregation and protective custody"); *Carter, supra,* at 103 (given similarities between disciplinary segregation and administrative segregation, disciplinary segregation does not impose atypical and significant hardship). Moreover, periodic administrative review does not assure that an administrative confinement will be of shorter duration than a disciplinary one. *Guzman, supra,* at *3.

 *Sandin* itself found that discretionary forms of confinement for the purpose of

---

16. N.Y.Comp.Codes R. & Regs. tit. 7, § 301.4(d) contains the basis for periodic review. This section states "[i]nmates assigned to administrative segregation status shall have such status reviewed every seven days for the first two months, and every 30 days thereafter, by a three-member committee consisting of a representative of the facility executive staff, a security supervisor, and a member of the guidance and counseling staff. The results of such review shall be forwarded, in writing, to the superintendent for final determination." N.Y.Comp.Codes R. & Reg. tit. 7, § 303 (McKinney 1996).

maintaining prison safety and security, such as administrative confinement, do not generally violate an inmate's protected liberty interest for to do so would contravene the policy expressed by the Court "that federal courts ought to afford appropriate deference and flexibility to state officials trying to manage a volatile environment." *Sandin, supra*, at 482–83, 115 S.Ct. 2293 (citing *Wolff, supra*, at 561–63, 94 S.Ct. 2963; *Hewitt v. Helms*, 459 U.S. 460, 470–71, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983)); (*Jones v. North Carolina Prisoner's Labor Union*, 433 U.S. 119, 125, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977)). The exercise of periodic review as required under New York State's Department of Corrections regulations, N.Y.Comp. Codes R. & Reg. tit. 7, § 303 (1996), for administrative SHU inmates does not independently create a liberty interest, rather, it is incident to the imposition of a discretionary form of confinement in furtherance of valid institutional, security, and other non-disciplinary administrative requirements which *Sandin* held insufficient to create a liberty interest. *Sandin, supra*, at 482–83, 115 S.Ct. 2293.

To hold that the absence of periodic review for disciplinary SHU confinement is a relevant factor under *Sandin* would imply that if such review is unavailable, lack of such review results in an atypical and significant hardship. But disciplinary confinement by nature is intended to maintain discipline, not to achieve other institutional purposes served by administrative SHU where periodic review is a desirable way to determine whether further confinement is required to achieve these valid non-disciplinary purposes. The deterrent aspect of the threat of disciplinary SHU could be seriously diluted if inmates believed that the period of any SHU confinement imposed as a penalty for misconduct was not a penalty they will necessarily serve.

There also is no basis to believe that an inmate such as Plaintiff reasonably would expect his disciplinary SHU confinement to carry with it an opportunity for such review. *Sandin, supra*, at 481, 486 n. 9, 115 S.Ct. 2293 (noting relevance of inmate's objective expectations in avoiding "major disruptions" in condition of confinement). Moreover,

finding a protected liberty interest based on such regulation of administrative discretion may encourage states to eliminate such forms of salutary guidance to the imposition of administrative confinement to avoid possible attachment of federal due process protections, thus engendering more § 1983 litigation contrary to *Sandin*'s specific finding. As the Court stated

> The approach embraced by *Hewitt* [finding liberty interests based on scope of regulatory language] discourages this desirable development: States may avoid creation of "liberty" interests by having scarcely any regulations, or by conferring standardless discretion on corrections personnel.

*Sandin, supra*, at 482, 115 S.Ct. 2293.

Nor does the absence of such review from the disciplinary system to which Plaintiff was subjected create a liberty interest by the force of the Due Process Clause itself. As noted, it surely came as no great surprise to Plaintiff that his term of disciplinary confinement was not subject to periodic review. A specified term of SHU confinement as a punishment, at least, as here, one substantially less than the prisoner's minimum sentence (25 years), cannot be said to be atypical as compared to the ordinary incidents of prison life, *Sandin, supra*, at 484, 115 S.Ct. 2293, as the most ordinary incident of prison life is the service of a specified period of incarceration as punishment without the prospect of periodic review.

In this case, as in *Sandin*, Plaintiff's SHU confinement did not impair his eligibility for parole consideration or early release and thus the enlargement of an already lengthy sentence. *Sandin, supra*, at 487, 115 S.Ct. 2293. The absence of periodic review of the duration of Plaintiff's disciplinary SHU sentence therefore does not create a liberty interest arising from the Due Process Clause itself. The unavailability of periodic review as required by regulations applicable to administrative SHU is therefore not an atypical and significant hardship relevant to the comparison between disciplinary and administrative SHU required by *Sandin*.

**b. Restrictions on personal property and telephone access in comparison to administrative SHU**

 Plaintiff's general assertions of atypicality based on the alleged denial of personal property and telephone privileges in disciplinary confinement as compared to administrative confinement are also insufficient to raise a genuine issue of material fact. In comparing disciplinary to administrative SHU confinement, courts have held that the loss of use of personal property and of access to a telephone does not create an atypical and significant hardship. *Guzman, supra,* at *3; *Jones, supra,* at 203.

The court therefore finds that Plaintiff has failed to raise a genuine issue of fact as to whether his SHU confinement may be considered atypical and significant based on the differences between administrative and disciplinary SHU as administered at Attica. Accordingly, federal due process requirements do not attach to Plaintiff's disciplinary hearings on this ground.

**C. *Duration of Plaintiff's Confinement***

The Second Circuit has also held that the duration of an inmate's confinement in SHU is a factor in determining whether a § 1983 plaintiff was deprived of a liberty interest sufficient under *Sandin* to invoke federal due process. *Wright, supra,* at 137; *Brooks, supra,* at 49. However, the Second Circuit has not held that any particular duration of disciplinary or administrative confinement in SHU constitutes an atypical and significant hardship. *See Jackson v. Johnson,* 15 F.Supp.2d 341, 361 (S.D.N.Y.1998). Here, Plaintiff served five and one-half months in disciplinary SHU confinement, and four months in keeplock in connection with the disciplinary charges.[17]

Numerous post-*Sandin* decisions throughout this circuit have held that confinement in SHU of up to one year does not implicate a protected liberty interest under *Sandin. See Brooks v. DiFasi,* 1997 WL 436750 (W.D.N.Y.1997) (on remand) (180 days of SHU disciplinary confinement); *Husbands,*

*supra,* at 217 (six months in SHU disciplinary confinement); *Black, supra,* at 316 (180 days confinement in SHU); *Marino v. Klages,* 973 F.Supp. 275, 278 (N.D.N.Y.1997) (SHU confinement of 300 days); *Jones, supra,* at 203 (191 days in SHU). *Compare Lee v. Coughlin,* 1998 WL 755151 (S.D.N.Y.1998) (376 day SHU sentence under conditions prevailing at Sing Sing and Southport prisons held atypical). These consistent judicial holdings support a finding that Plaintiff's twenty-two week disciplinary SHU confinement was not an atypical and significant hardship.

 Additionally, as Plaintiff is currently serving an indeterminate sentence with a minimum of 25 years to life following his conviction in state court for murder, Annucci Affidavit, ¶ 26, the duration of Plaintiff's incarceration for five and one half months in disciplinary SHU and four months in keeplock was not atypical and significant. *See Black, supra,* at 316 (plaintiff's confinement to SHU for 180 days not atypical and significant as plaintiff was serving sentence of 13 to 36 years); *Husbands, supra,* at 217 (plaintiff's six month confinement in · SHU not atypical and significant duration, as plaintiff was serving an indeterminate sentence of six months to life); *Roucchio v. Coughlin,* 923 F.Supp. 360, 373 (E.D.N.Y.1996) (plaintiff's confinement to SHU for 147 days not atypical and significant duration in view of fifteen-years-to-life duration of sentence); *Quartararo v. Catterson,* 917 F.Supp. 919, 937 (E.D.N.Y.1996) (plaintiff's confinement in SHU for 14 days not atypical and significant in view of plaintiff's sentence of nine years to life). The proportionality of the SHU sentence at issue, based on serious misconduct, to the inmate's underlying sentence, based on conviction for murder, demonstrates it is within the "range of confinement to be normally expected." *Sandin, supra,* at 487, 115 S.Ct. 2293. Compared to Plaintiff's 25 year minimum sentence, Plaintiff's 168 day SHU and 120 day keeplock sentences standing

---

**17.** May 31, 1990 to November 15, 1990 and November 15, 1990 to March 15, 1991, respectively.

alone, cannot be said to constitute a significant hardship.[18]

## D. *Disciplinary Hearing Due Process Violations*

■ As discussed, Plaintiff has failed to assert valid grounds or raise a genuine issue of material fact as to whether the conditions in Attica disciplinary SHU and long-term keeplock create atypical and significant hardships in relation to the ordinary incidents of prison confinement. *Sandin, supra,* at 480, 115 S.Ct. 2293. Even if it were found that the Plaintiff had raised such grounds or genuine issues of material fact on this threshold question, trial would be unnecessary as there were no constitutional violations in the conduct of Plaintiff's disciplinary hearings.[19]

As set forth in the Defendants' motion for summary judgment, Plaintiff does not show the existence of any genuine issue of fact as to the conduct of his disciplinary hearings. As both Plaintiff and Defendants have had an opportunity to fully develop this issue, trial is therefore unnecessary to establish the facts upon which Plaintiff's due process claims relating to the conduct of the disciplinary hearings at issue are based, and the merits of Plaintiff's specific claims may be considered.

■ ■ In *Sandin,* the Court directed that allegations based on denial of procedural due process must be evaluated in accordance with the procedural protections set forth in *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). *Sandin, supra,* at 480, 115 S.Ct. 2293. Where an inmate disciplinary hearing may result in the loss of a protected liberty interest, due process requires that the inmate be afforded certain procedur-

al protections, including (1) advance written notice of the charge; (2) an opportunity, when consistent with institutional safety and correctional goals, to call witnesses and present documentary evidence in defense of the charge; (3) a written statement by the fact finder of the evidence relied on and the reasons for the disciplinary action; and (4) support for the findings "by some evidence in the record." *Walpole v. Hill,* 472 U.S. 445, 454, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985).

Plaintiff claims that the disciplinary hearings conducted by Defendants Bennett and Kihl were improperly conducted and resulted in several violations of his right to federal due process. Regarding the first disciplinary hearing, Plaintiff alleges that his due process rights were violated when he was denied a witness, Correction Officer Covert, whom Plaintiff sought to call in his defense. Complaint, ¶ 14. Plaintiff also claims that his due process rights at that hearing were violated when his request to submit videotape footage and photographic evidence of the Plaintiff's alleged misconduct in connection with the prior disturbance was denied by Defendant Bennett. Complaint, ¶¶ 13, 14. Plaintiff further claims that his due process rights were violated when Defendant Selsky failed to correct or remedy the alleged due process violations in the first disciplinary hearing, Complaint, ¶ 25, and when Defendant Kelly failed to act in response to Plaintiff's letter dated June 11, 1990 stating that he had been wrongfully charged with violations of the prison regulations and requesting assistance. Complaint, ¶¶ 22, 23.

■ Although Plaintiff has claimed due process violations occurred at the first disci-

---

**18.** In an effort to demonstrate that the conditions of Plaintiff's SHU sentence were not atypical and significant, Defendants have submitted statistics indicating the number of SHU and long-term keeplock confinements · from January 1991 through December 1996 in New York State. See Exhibits D and E to Annucci Affidavit. In keeping with the basis of comparison employed by this court, *see* Discussion, *supra,* at 312–313, the state-wide statistics provided by Defendants are not dispositive on the issue of atypicality.

**19.** While the Second Circuit has suggested "fact finding" through discovery on whether atypical and significant conditions obtain as to the SHU confinement at issue, *Sealey, supra,* at 52, where

no material issues of fact relating to the challenged conditions of confinement are presented, the matter may be determined on summary judgment. *See, Porter v. Coughlin,* 964 F.Supp. 97, 102 (W.D.N.Y.1997) ("a trial is not always necessary when applying and dismissing cases under Sandin."). *Compare Trammell v. Mantello,* 1996 WL 863518, *6 (W.D.N.Y.1996) (atypical and significant hardship determination is a factual question unsuitable for summary adjudication). Whether such conditions, if established at trial or on summary judgment, constitute atypical and significant hardships is a question of law. *See, e.g., Sandin, supra,* at 485, 115 S.Ct. 2293; *Beverati v. Smith,* 120 F.3d 500, 503 (4th Cir.1997).

plinary hearing, where a second disciplinary hearing rectifies the errors at the first hearing, a plaintiff cannot assert a federal due process violation. *Harper v. Lee*, 938 F.2d 104, 105 (8th Cir.1991); *Gaston v. Coughlin*, 861 F.Supp. 199, 207 (W.D.N.Y.1994). Thus, if Plaintiff's challenged SHU discipline was imposed after a second hearing which comported with federal procedural due process requirements, alleged errors which occurred at the first hearing are rendered irrelevant. Although none of the parties have provided a transcript or other evidence of the proceedings during the first disciplinary hearing, this court finds that, provided as discussed, *infra*, it was conducted in accordance with federal due process requirements applicable to such hearings, the second disciplinary hearing rectified the alleged due process violations which occurred during the first disciplinary hearing, as at the second hearing, Defendant Kihl reviewed the videotape footage of the prison disturbance at Plaintiff's request and Plaintiff was provided the opportunity to call Corrections Officer Covert but declined to do so. *See* Selsky Affirmation, Exhibit A.[20]

 As to the second hearing, Plaintiff first claims that his right to procedural due process was violated as Defendant Kihl was not impartial. Complaint, ¶ 28. Due process requires that the hearing officer is unbiased and has not predetermined the outcome of the case. *Francis v. Coughlin*, 891 F.2d 43, 46 (2d Cir.1989). The standard established in *Wolff* requires that the hearing officer not be so insufficiently impartial as to present a "hazard of arbitrary decisionmaking." *Black, supra*, at 317. In order to defeat a motion for summary judgment upon asserted bias of a hearing officer, a plaintiff-inmate must "be armed with [something] more than conclusory allegations of bias and prejudgment." *Francis, supra*, at 47.

In the present case, there is nothing in the record to indicate that Kihl prejudged the evidence at Plaintiff's second hearing. *Black, supra*, at 317. This court's Decision

and Order dated March 18, 1996 found, based on Plaintiff's failure to present evidence of bias, that Defendant Kihl was not biased. As Plaintiff has not challenged this finding and no further evidence of bias has been offered by Plaintiff, there is no evidence to show Defendant Kihl was not impartial during the second hearing and summary judgment must be granted as to that claim.[21]

Plaintiff also contends he was denied due process during the second hearing, as he was not permitted to view a videotape of the disturbance. Following remand from the state court proceeding, at Plaintiff's request, Defendant Kihl reviewed the videotape during the second hearing and concluded that the Plaintiff was not visible in the portions of the videotape designated by Plaintiff and, therefore, the tape was not conclusive on Plaintiff's guilt or innocence. Affirmation of Donald Selsky, filed August 15, 1995 (Docket Item No. 39) ("Selsky Affirmation"), Exhibit B ("Transcript") at 18. Defendant Kihl stated during the second hearing that Plaintiff would not, however, be permitted to view a videotape of the disturbance for security reasons. Transcript at 24. This determination was reviewed and affirmed by Defendant Selsky upon Plaintiff's administrative appeal:

> At the time of the review, the courts which had reviewed the issue had determined that it was sufficient for a hearing officer to view the videotapes of an incident, and that the accused inmate had no right to personally view such videotapes.

Selsky Affirmation, ¶ 8.

 It is settled that prison administrators must be "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 547, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). As to a prison disciplinary hearing, the Fourteenth Amendment's due process guarantee requires the hearing officer to grant the prisoner "an

---

**20.** As to the alleged due process violations by Defendants Selsky and Kelly, *see* Discussion, *infra*, pp. 329–331. These claims, even if valid, would not affect the validity of the hearings at issue.

**21.** Plaintiff did not raise the issue of Defendant Kihl's alleged impartiality on appeal, and consequently it was not addressed by the Second Circuit. *Wright, supra*, at 138.

opportunity, when consistent with safety and correctional goals, to call witnesses and present documentary evidence in his defense," *Walpole, supra,* at 454, 105 S.Ct. 2768, but "the full panoply of rights" due a defendant in a criminal proceeding do not apply. *Zavaro v. Coughlin,* 970 F.2d 1148, 1152 (2d Cir. 1992); *Mays v. Mahoney,* 1994 WL 48831, *6 (S.D.N.Y.1994).

A prison disciplinary hearing officer may, notwithstanding, decline to accept such evidence in the interests of institutional security and correctional goals or because of lack of relevance or necessity. *Wolff, supra,* at 566–67, 94 S.Ct. 2963. While a disciplinary fact finder need not give a reason for the denial of an inmate's request for witnesses or potentially exculpatory evidence contemporaneously with the hearing, it may later be required to provide reasons, and demonstrate that the reasons are logically related to institutional safety or correctional goals. *Ponte v. Real,* 471 U.S. 491, 497, 105 S.Ct. 2192, 85 L.Ed.2d 553 (1985). It is, however, the prison's burden, not the inmate's, to prove the denial was not arbitrary or capricious. *Id.* at 499, 105 S.Ct. 2192.

The exclusion of videotape evidence from disciplinary hearings or denying an inmate access to such material may violate due process. *See, e.g., Malik v. Tanner,* 697 F.Supp. 1294, 1300 n. 7 (S.D.N.Y.1988) (noting that "[h]ad plaintiff informed defendant prior to the hearing that plaintiff wanted to call inmate witnesses or to present the videotape of the cell block at the time of the incident, defendant's refusal to consider such evidence would violate state law and due process"). However, Kihl's actions regarding the video present no federal due process violations for two reasons.

First, the videotape was not entirely excluded from the second disciplinary proceeding because Kihl reviewed the videotape as Plaintiff had requested and determined that Plaintiff was not visible at the pertinent time. Transcript at 24. It is apparent from the record that Kihl's review of the videotape was not determinative in establishing that Plaintiff had committed the charged offenses and therefore did not contribute to Kihl's finding of Plaintiff's guilt; otherwise it is reasonable to presume Kihl would have noted such in his findings. *See* Transcript, at 25, 29.

Second, Defendant Kihl asserted a valid institutional interest under relevant caselaw in withholding the videotape, stating that security concerns required such. Transcript at 18. Prison officials may be required to explain, in a limited manner, the reason for the denial of an inmate's requests for access to evidence during a disciplinary hearing. *See Ponte, supra,* at 497, 105 S.Ct. 2192. So long as the reasons are logically related to preventing undue hazards or to institutional safety or correctional goals, the explanation will meet the due process requirements as outlined in *Wolff.*[22] *Id. See Wolff, supra,* 566–67 (right to call witnesses and produce evidence may be limited by irrelevance, lack of necessity, or institutional safety); *Barnes v. Fauver,* 1993 WL 232320, *4 (D.N.J.1993) (defendants had not complied with inmate's right to present evidence as they had not alleged that viewing videotape footage would interfere with the institutional goals of order and security).

As Plaintiff, in response to Defendants' motion, has not contested that Kihl stated a valid reason for not providing access to the videotape, the court finds that Plaintiff has failed to show Defendants violated his federal due process rights in denying his request to view the videotape. Additionally, as the videotape concededly failed to incriminate Plaintiff, there was minimal, if any, adverse impact on Plaintiff's defense.

Plaintiff also claims his right to due process was violated by Kihl's denial of Plaintiff's request to call two witnesses at the second disciplinary hearing.

---

**22.** While it may be desirable for such reasons to be stated in writing and thereby preserved as part of the disciplinary record, to permit potential administrative and judicial review, Plaintiff has not claimed Kihl's failure to do so violated due process nor is there any authority to support such a requirement under *Wolff.* Moreover, the Supreme Court expressly refused to "prescribe" as a constitutional requirement that the disciplinary board must state in writing at the time of the hearing its reasons for refusing to call a witness. *See Ponte, supra,* at 496, 105 S.Ct. 2192.

In its decision on Plaintiff's Article 78 proceeding, issued January 23, 1992, New York Supreme Court found that Defendant Kihl's failure to allow Plaintiff to call two inmate witnesses, Daniel Kinch and David Gilbert, denied Plaintiff's right to a fair and impartial hearing. *See* Exhibit 2 to Plaintiff's Memorandum at 2. Specifically, Acting Justice Dadd found it was "unfair" for Kihl to have elicited a stipulation from Plaintiff that these witnesses were unnecessary and then "implicitly" reject Plaintiff's witnesses' testimony as not credible. Exhibit 2 to Plaintiff's Memorandum at 2. The court also held Kihl should have heard Kinch and Gilbert to resolve the conflicting statements between the two misbehavior reports and Plaintiff's witnesses. *Id.* However, in reaching such conclusions, the court referred to no federal constitutional requirements.[23] Moreover, as noted, Kihl did hear the Plaintiff's witness Reid, whose testimony Plaintiff agreed would be similar to that of Kinch and Gilbert, and therefore had opportunity to evaluate the credibility of that witness.

Title 7 of the New York Compilation of Codes, Rules and Regulations, § 254.5 governs the right of an inmate to call witnesses to testify on his behalf at a prison superintendent's hearing and provides, in relevant part, that

> [t]he inmate may call witnesses on his behalf provided their testimony is material, is not redundant, and doing so does not jeopardize institutional safety or correctional goals. If permission to call a witness is denied, the hearing officer shall give the inmate a written statement stating the reason for the denial, including the specific threat to institutional safety or correctional goals presented.

N.Y.Comp.Codes R. & Regs. tit. 7, § 254.5(a) (1996).

**23.** In its decision annulling the first hearing, the state court relied upon *Matter of Coleman v. Coombe*, 65 N.Y.2d 777, 492 N.Y.S.2d 944, 482 N.E.2d 562 (N.Y.1985) (Mem.). *See* Exhibit 1 to Plaintiff's Memorandum at 2. In *Coleman*, the court affirmed the order of Supreme Court annulling petitioner's disciplinary hearing solely on state law grounds, specifically noting it found no need to consider whether the hearing officer's refusal to permit petitioner's brother to testify in mitigation or as to petitioner's necessity defense,

However, whether a due process violation under the Fourteenth Amendment has occurred is determined by reference to federal law. *Wolff, supra,* at 539, 94 S.Ct. 2963. In *Wolff,* the Supreme Court held that denial of the right to present witnesses at a prison disciplinary hearing may constitute a due process violation. *Id.* An inmate's federal due process rights are violated when a prison hearing officer refuses to interview witnesses without assigning a reason "logically related to preventing undue hazards to 'institutional safety or correctional goals.' " *Fox v. Coughlin,* 893 F.2d 475, 478 (2d Cir.1990) (quoting *Wolff, supra,* at 566, 94 S.Ct. 2963).

As stated, under federal due process, such right to present witnesses may be denied on the basis of irrelevancy, lack of necessity, or to maintain the security of the correctional facility. *See Wolff, supra,* at 566, 94 S.Ct. 2963 (disciplinary committee should state reasons for denial of request to call witnesses, whether it be for irrelevance, lack of necessity, or hazards presented); *Walker v. McClellan,* 126 F.3d 127, 130 (2d Cir.1997) (a hearing officer is permitted to exclude irrelevant or unnecessary testimony); *Kingsley v. Bureau of Prisons,* 937 F.2d 26, 30 (2d Cir. 1991) (prisoner's request for a witness can be denied on the basis of irrelevance or lack of necessity); *Fox, supra,* at 478 (prison official's failure to interview to witnesses did not violate clearly established right, as refusal was based on unavailability of witness and redundancy of testimony).

Here, as noted, the transcript of the second hearing shows that Plaintiff agreed with Kihl that the testimony of Kinch and Gilbert would be similar to testimony by Eric Reid which had been provided earlier in the hearing on Plaintiff's behalf and, because the proposed testimony was merely corrobora-

which the court found was material and relevant, also violated federal due process under *Wolff v. McDonnell. Coleman, supra.* In the second Article 78 proceeding, annulling the hearing conducted by Defendant Kihl, the court's decision rested, apparently, on the sole ground that Kihl violated N.Y.Comp.Codes R. & Regs., tit. 7, § 254.5(a) (1996) which allows exclusion of redundant testimony at a prison disciplinary hearing. *See* Exhibit 2 to Plaintiff's Memorandum at 2.

tive of Reid's testimony, Plaintiff dropped his demand to call further witnesses. Transcript at 18. Plaintiff admitted on the record he had heard the testimony of Kinch and Gilbert at the first hearing, that their testimony would be similar to that of Reid, and that the purpose of offering such testimony would be to corroborate the testimony of Reid. Transcript at 17.

As the testimony of Kinch and Gilbert would therefore have been redundant and Plaintiff stipulated as such, Kihl could reasonably determine their testimony was unnecessary for the second hearing and there was no need to recall these witnesses. Even if the transcript was interpreted to show Plaintiff did not agree to the stipulation, Kihl's statement that he would treat Kinch and Gilbert as credible witnesses and corroborative of Plaintiff's asserted innocence removes any basis for finding a due process violation on this ground.[24] As the record demonstrates, Plaintiff's right to present evidence in his own defense and right to call witnesses during the second disciplinary hearing were not improperly restricted, at least not beyond the extent permitted under *Wolff*. Plaintiff's claims of a federal due process violation as to this ground are therefore without merit.

Plaintiff's claim that Defendant Selsky violated his right to due process by affirming the findings in the first and second hearings also fails, as Selsky's action was proper under federal due process standards. In reviewing whether an inmate was deprived of due process under state law during prison disciplinary hearings New York courts base their decision on whether the hearing officer's determination was supported by "substantial evidence." *See* N.Y.Civ.Prac.L. & R. § 7803 (McKinney 1996); *In re Williams v. Coughlin*, 190 A.D.2d 883, 593 N.Y.S.2d 570 (App.Div.3d Dep't), *appeal denied*, 82 N.Y.2d 651, 601 N.Y.S.2d 581, 619 N.E.2d 659 (N.Y.1993). However, federal due process imposes a lesser standard of proof, *i.e.*, that a hearing officer's determination be based on "some evidence." *Walpole, supra*, at 455, 105 S.Ct. 2768; *Gaston, supra*, at 207.

The amount of evidence required to support a finding of guilt in a prison disciplinary hearing under the "some evidence test" is minimal. *Black, supra*, at 317. In determining matters of sufficiency of evidence, the district court's function is to determine "whether there is any evidence in the record that could support the conclusion reached" by the hearing officer. *Walpole, supra*, at 455–56, 105 S.Ct. 2768.

In the present case, prior to making his determination, Kihl considered Plaintiff's statements during the second disciplinary hearing denying participation in the prison disturbance and stating "[m]ost of the time I was against C block wall playing chess and talking with friends." Transcript at 5. In response to Plaintiff's assertion in the state court proceeding that Kihl's determination was not supported by substantial evidence, Selsky stated that he determined that the two misbehavior reports specifically described plaintiff's role in the incident and the determinations by Bennett and Kihl were therefore supported by substantial evidence. Selsky Affirmation, ¶ 7. At a minimum, Plaintiff's own version placed him in the same yard where the misconduct at issue was observed and reported. Whether it was plausible to believe Plaintiff's assertion that he was innocently playing chess during the entire time period, from early evening until dawn of the next morning, was a question well within Kihl's discretion to decide as the fact finder.

As Kihl considered these statements and his determination was supported by two misbehavior reports filed by two corrections officers specifically describing Plaintiff's role in the incident, *see* Exhibit A to Selsky Affirmation, the court finds that Kihl's determination meets the "some evidence" standard, and,

---

24. The procedure by which Kihl elicited Plaintiff's stipulation was criticized by Acting Justice Dadd. *See* Exhibit 2 to Plaintiff's Memorandum at 2. However, as noted, *see* Discussion, *supra*, at 328, n. 23, in determining that Kihl had violated Plaintiff's right to call witnesses and present evidence in his own defense during the second disciplinary proceeding, Acting Justice Dadd relied only upon N.Y.Comp.Codes R. & Regs., tit. 7, § 254(a) (1996) in reaching his decision, without reference to federal law.

**330**

therefore, Plaintiff received all the process he was due under federal law.[25] *See Rudd v. Sargent,* 866 F.2d 260, 262 (8th Cir.1989) (statements in corrections officer's written disciplinary report constitutes "some evidence" to support the conclusion that inmate committed prison disciplinary rule violation); *Rhoden v. Allen,* 1997 WL 587654, *9 (N.D.Ill.1997) (prison disciplinary report of incident involving inmate constitutes "some evidence"); *Hamilton v. Scott,* 762 F.Supp. 794, 800 (N.D.Ill.1991) (correction officer's disciplinary report, although "meager" evidence, is still "some evidence" under federal due process).

Furthermore, as this court has determined that no due process violations occurred at the second disciplinary hearings, thereby rendering moot any violations which may have occurred at the first hearing, Selsky's affirmance of these hearings cannot be considered a violation of Plaintiff's right to due process. *See Afrika v. Selsky,* 750 F.Supp. 595, 602 (S.D.N.Y.1990) (as inmate was afforded fair hearing, inmate's right to due process was not violated even though affirming official knew that hearing officer had failed to provide written justification for denial of witnesses).

As to Defendant Kelly, Plaintiff's allegation that Kelly violated Plaintiff's right to due process by failing to intervene and remedy the alleged due process violations also fails to raise a valid due process claim. As this court has determined that no due process violations arose based on either the disciplinary hearings or on administrative appeal, the issue of Kelly's personal involvement based on the conduct of his designated officers is moot. *Bedoya, supra,* at 353; *Pacheco v. Vanwyk* 1997 WL 642540, *1 (N.D.N.Y.1997).

 Even if due process violations were found, Plaintiff has failed to raise a genuine issue of material fact as to whether Defen-

dant Kelly was personally involved in the alleged due process violations. The liability of supervisory officials under § 1983 cannot be premised on *respondent superior. Monell v. Dep't of Social Serv.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Jemmott v. Coughlin,* 85 F.3d 61, 67 (2d Cir.1996); *Al–Jundi v. Estate of Rockefeller,* 885 F.2d 1060, 1065–66 (2d Cir.1989); *Villante v. Dep't of Corrections,* 786 F.2d 516, 519 (2d Cir.1986); *Bolanos v. Coughlin,* 1993 WL 762112, *24 (S.D.N.Y.1993). Consequently, a defendant's personal involvement in the alleged constitutional violation is a prerequisite to the imposition of damages. *Monell, supra,* at 690–95, 98 S.Ct. 2018; *Al–Jundi, supra,* at 1065–1066.

 A supervisory official may be personally involved in a § 1983 violation by (1) directly participating in the infraction or ordering that the action be taken; (2) failing to remedy a wrong after learning of the violation; (3) having created or allowed a policy to continue under which the violation occurred; (4) having been grossly negligent in managing the subordinates who caused the violation. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996); *Al–Jundi, supra,* at 1060. While prison supervisory officials are not required to be omniscient, they do have a duty to make reasonable inquiries into the activities of their subordinates and the condition of the inmates held in their custody. *Villante, supra,* at 522.

In the present case, Plaintiff has not raised a genuine issue of material fact as to Defendant Kelly's personal involvement based on any of the foregoing theories of liability. Specifically, Plaintiff has failed to raise a genuine issue that Kelly was personally involved by his failure to remedy a wrong after learning of the due process violations. Direct participation is not always necessary for personal involvement and a supervisory official may be personally liable if he or she has

---

**25.** In the inmate misbehavior report issued on May 26, 1990 by Corrections Officer T. Valentino regarding the disturbance, Valentino stated, "[o]n the above date and time while covering C-yard from C-yard tower, I C.O.T. Valentino observed inmate Wright 88–C–900 start a fire in the middle of C-yard." Exhibit A to Selsky Affirmation. In the misbehavior report issued on May

27, 1990 by Corrections Officer R. Vogel regarding the same incident, Officer Vogel stated that he observed Plaintiff, while in possession of a weight bar, breaking windows along a prison corridor. *Id.* Officer Valentino also stated that he had seen Defendant Wright breaking windows during the disturbance in his May 26, 1990 misbehavior report. *Id.*

actual or constructive notice of unconstitutional practices and demonstrates gross negligence or deliberate indifference by failing to act. *Al-Jundi, supra*, at 1066.

■ In the instant matter, Plaintiff appealed both disciplinary hearing determinations to Defendants Coughlin and Selsky, as required by N.Y.Comp.Codes R. & Regs., tit. 7, § 254.8 (1996). Complaint, ¶ 18, 30. This section states "[a]ny inmate shall have the right to appeal the disposition of any superintendent's hearing, to which he was a party, to the commissioner within 30 days of receipt of the disposition." N.Y.Comp.Codes R. & Regs., tit. 7, § 254.8 (1996). Plaintiff's first administrative appeal was filed on June 11, 1990, Complaint, ¶ 18, and his letter requesting assistance was sent to Defendant Kelly on June 11, 1990, Complaint, ¶ 22. As Plaintiff had not completed the administrative appeal process at the time of his requests for assistance, Kelly's failure to respond to Plaintiff's requests cannot be considered deliberate indifference or gross negligence or a failure to remedy a known constitutional wrong.

■ Additionally, simply receiving letters or complaints does not render an individual personally liable. *Bolanos, supra*, at *25. *See also Rode v. Dellarciprete*, 845 F.2d 1195, 1207–8 (3d Cir.1988) (transmitting a complaint to governor's office of administration insufficient basis to impose liability); *Crowder v. Lash*, 687 F.2d 996, 1005–06 (7th Cir.1982) (commissioner's general knowledge of prison conditions and receipt of letters from plaintiff insufficient to impose liability); *Garrido v. Coughlin*, 716 F.Supp. 98, 100 (S.D.N.Y.1989) (allegations that Coughlin "ignored Garrido's letter of protest and request

for an investigation ..." insufficient to hold him liable); *Johnson v. Lane*, 596 F.Supp. 408, 409 (N.D.Ill.1984) ("That [the Director of Illinois Department of Corrections] may have been apprised of the misconduct of subordinates does not ... subject him to personal liability").

Nor has Plaintiff alleged any facts which could be interpreted as establishing Kelly's direct participation in the alleged due process violations, a longstanding policy or custom for which Kelly is responsible, or grossly negligent training or supervision of Defendants Kihl or Bennett. *See Bolanos, supra*, at *23–24. As discussed, Plaintiff has failed to raise a genuine issue of material fact whether he suffered any due process violations as a result of his disciplinary hearings, and therefore the issue of Kelly's personal involvement on these grounds is moot. *See Bedoya, supra*, at 353; *Pacheco, supra*, at *1. However, even if a violation of Plaintiff's due process rights was found, Plaintiff has failed to raise a genuine issue as to whether Kelly was personally involved in any such violation.

In sum, Plaintiff has failed to sufficiently establish that he suffered atypical and significant hardship or that a violation of his federal due process rights occurred, summary judgment in favor of the Defendants is required. Although Plaintiff may have been innocent of the disciplinary violations in this case, he has failed to demonstrate any basis for trial on whether his federal due process rights were violated. Guilty or innocent, this record shows Plaintiff received all the fair process which federal law, even if applicable, required.[26]

---

**26.** In reaching this determination, the court notes that New York prison inmates with claims similar to Plaintiff's are not without a remedy. State court judges are not reticent to enforce state regulations or laws where an inmate asserts a violation of his legal rights, as shown by the New York Supreme Court decisions in the present case. *See* Discussion, *supra* at note 23 and accompanying text; Exhibits 1 and 2 to Plaintiff's Memorandum. Moreover, an inmate may even claim damages in state court for a violation of his state constitutional rights. *See Brown v. State*, 89 N.Y.2d 172, 652 N.Y.S.2d 223, 674 N.E.2d 1129, 1138–39 (N.Y.1996). Although some courts have refused to permit a recovery of

damages under the due process clause of the state constitution, N.Y. CONST. art. I, § 6 (McKinney, 1996), these courts have relied upon the availability of alternative remedies, under state common law or federal statute, in denying such recovery. *See Wahad v. Fed. Bureau of Investigation*, 994 F.Supp. 237, 240 (S.D.N.Y. 1998) (denying recovery under state constitution's due process clause where plaintiff has alternative remedy under § 1983); *Remley v. State*, 174 Misc.2d 523, 665 N.Y.S.2d 1005, 1008 (Ct. Cl.1997) (while due process provision in Art. I, § 6 of state constitution is self-executing and provides a basis of relief, as plaintiff has available common law tort remedy "no useful pur-

### 2. *Res Judicata / Collateral Estoppel*

Plaintiff asserts that res judicata and collateral estoppel prevent Defendants from contesting that his due process rights were violated. Plaintiff contends that the prior state court proceedings found such violations to have occurred. Plaintiff's Memorandum, ¶¶ 15–18. Defendants argue that the state court proceedings did not address whether the Plaintiff's disciplinary confinement rises to the level of a liberty interest warranting federal due process protection under *Sandin* and *Wolff*. In his opposing memorandum, Plaintiff argues that the holdings of the state court during the Article 78 proceedings should be afforded a "presumption of correctness" and deference in accordance with the Full Faith and Credit Clause, art. IV, § 1 of the United States Constitution. Plaintiff's Memorandum at 6–8. *See Migra v. Warren City Sch. Dist.* 465 U.S. 75, 81, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984) (under the Full Faith and Credit Clause of the Constitution, U.S. Const.Art. IV, § 1, a federal court must give the same preclusive effect to a state court judgment "as would be given that judgment under the law of the State in which the judgment was rendered"). *See also* 28 U.S.C. § 1738.

The principles of res judicata (claim preclusion) and collateral estoppel (issue preclusion) bar the relitigation of matters which the parties had a full and fair opportunity to litigate in a prior action. *Allen v. McCurry,* 449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980). In the instant case, a review of the state court decisions in the prior Article 78 proceedings demonstrates the state court did not determine whether a protected liberty interest under the Due Process Clause of the Fourteenth Amendment had been violated by Defendants. *See* Exhibits 1, 2 to Plaintiff's Memorandum.

It is established that res judicata may not be asserted in a § 1983 action based on a prior Article 78 proceeding in New York Supreme Court, as the relief available in each remedy differs. *See Davidson v. Capuano,* 792 F.2d 275, 278 (2d Cir.1986) (res judicata inapplicable in federal § 1983 action to state court Article 78 proceedings as damages for civil rights violations generally not available in such proceedings); *Roucchio, supra,* at 377 (in § 1983 action res judicata does not attach to prior Article 78 state court determination in light of difference in relief sought).

With regard to collateral estoppel, this doctrine only applies if the issue at bar was actually and necessarily decided in a prior proceeding. *Colon v. Coughlin,* 58 F.3d 865, 869 n. 2 (2d Cir.1995). Here, as the state court did not decide the Article 78 proceedings on federal constitutional grounds, *see* Exhibits 1, 2 to Plaintiff's Memorandum, collateral estoppel does not apply.[27]

### 3. *Qualified Immunity*

Defendants alternatively argue they are entitled to summary judgment based on qualified immunity. Defendants' February 18, 1998 Memorandum (Docket Item No. 50) at 24. Qualified immunity shields prison officials who perform discretionary functions from liability if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable prison official would have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 806, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Washington Square Post No. 1212 v. Maduro,* 907 F.2d 1288 (2d Cir.1990).

Whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the objective level of reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken. *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *Lowth v. Town of Cheektowaga,* 82 F.3d 563, 568–69 (2d Cir.1996); *van Emrik v. Chemung County Dep't of Soc. Servs.,* 911 F.2d 863, 865–66 (2d Cir.1990); *Robison v. Via,* 821 F.2d 913, 920–21 (2d

---

pose would be served" by implying a remedy under the state constitution). Where, like the present case, a plaintiff has no alternative remedy, a plaintiff may assert such a claim based on

the state constitution's due process clause or other applicable state law or regulation.

**27.** *See supra* note 23 and accompanying text.

Cir.1987). Here, because Plaintiff's right to federal due process was not clearly established at the time of the hearings at issue, even if Plaintiff's due process rights had been violated based on either later declared law or a holding in this case, Defendants were qualifiedly immune.

A defendant is entitled to summary judgment based on qualified immunity "if the defendant adduce[s] sufficient facts [such] that no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to the plaintiffs, could conclude that it was objectively unreasonable for the defendant to believe that he was acting in a fashion that did not clearly violate an established federally protected right." *Robison, supra,* at 921 (internal quotation omitted). Stated another way, a defendant is entitled to qualified immunity under the objectively reasonable standard if "officers of reasonable competence could disagree on the legality of the defendant's actions." *Lennon v. Miller,* 66 F.3d 416, 420 (2d Cir.1995).

Where the objective reasonableness of an officer's actions depends on disputed facts, summary judgment is properly denied. *Rivera v. United States,* 928 F.2d 592, 607 (2d Cir.1991); *Brawer v. Carter,* 937 F.Supp. 1071, 1082 (S.D.N.Y.1996). Provided that no factual issues are disputed, however, the application of qualified immunity to the facts is a question of law for the court to decide. *Finnegan v. Fountain,* 915 F.2d 817, 821 (2d Cir.1990). Here, the facts relevant to qualified immunity are not disputed.

In the present case, Defendants' claim that they are qualifiedly immune from suit as the law defining the existence of Plaintiff's liberty interest and entitlement, if any, to federal due process were not clearly established at the time of Plaintiff's hearings. Defendants' February 18, 1998 Memorandum at 24. Plaintiff claims that Defendants are not entitled to qualified immunity, as he was denied his right to due process as a result of Defendant Bennedict's refusal to permit Plaintiff to

review the videotapes of the incident and Defendant Kihl's refusal to call two witnesses, Daniel Kinch and Dave Gilbert, at the second disciplinary hearing. Plaintiff's Memorandum, ¶¶ 86–87. As neither party has disputed the facts, whether at the time of the disciplinary hearings Defendants violated a clearly established right of the Plaintiff is a question for this court. *See Finnegan, supra,* at 821.

A right is clearly established if it (1) was defined with reasonable specificity, (2) its existence has been affirmed by either the Supreme Court or the relevant circuit court, and (3) a reasonable defendant official would have understood under the existing law that his acts were unlawful. *Brown v. City of Oneonta, N.Y. Police Dep't,* 106 F.3d 1125, 1131 (2d Cir.1997). Although *Wolff v. McDonnell* established that a prisoner is entitled to minimum elements of fair procedure in connection with the imposition of a loss of good time credits, a then-recognized liberty interest protected by the Fourteenth Amendment, the Supreme Court itself stated in *Sandin* that "this Court has not had the opportunity to address in an argued case the question whether disciplinary confinement of inmates *itself* implicates constitutional liberty interests." *Sandin, supra,* at 486, 115 S.Ct. 2293 (emphasis added). Further, in the Second Circuit, a liberty interest entitling the disciplined inmate to have the hearing officer interview requested witnesses absent a valid reason was established in *Fox, supra,* at 478, decided January 4, 1990, but in that case the plaintiff had, in addition to receiving an SHU sentence of 180 days, also lost 180 days of good time.[28] Therefore, based solely on disciplinary SHU confinement for durational periods equal to that imposed on Plaintiff here, Defendants could reasonably have believed that Plaintiff's right to federal due process requirements, based on a sentence of five and one half months in disciplinary confinement and four months in keeplock confinement, was not clearly established at the time of the Plaintiff's second hearing in 1992.

---

**28.** *Contra Lee, supra,* at 637 (rejecting qualified immunity defense, as "whatever change in the law *Sandin* occasioned in 1995 ... process to which plaintiff was entitled and defendants' failure to provide it violated a liberty interest [in remaining free from segregated confinement] that was clearly established").

Alternatively, assuming Plaintiff's right to federal due process under *Wolff v. McDonnell* was clearly established, Defendants are nevertheless entitled to qualified immunity. With regard to the denial of Plaintiff's request to view the videotape of the prison disturbance and alleged denial of his right to call witnesses, while prison inmates have the right to be informed of and respond to evidence against them, *Francis v. Coughlin*, 891 F.2d 43 (2d Cir.1989), an inmate's right to examine adverse evidence and call witnesses is limited by institutional safety concerns, relevance, and necessity, *Wolff, supra*, at 566, 94 S.Ct. 2963, and courts in this circuit have not extended prison inmates an absolute right to demand access to videotape evidence or call additional witnesses requested by an inmate.

As Defendants asserted a valid reason under *Wolff* for withholding the videotape evidence and refusing to call Plaintiff's witnesses, Transcript at 18, it was objectively reasonable for Defendants to believe that in conducting Plaintiff's disciplinary hearings and deciding administrative appeals from such hearings, they did not violate Plaintiff's rights to federal due process. In addition, Defendant Kihl viewed the video tape in keeping with the order of the state court in the second Article 78 state court proceeding, thereby negating Plaintiff's alleged due process violations, assuming any occurred, as to the first disciplinary hearing. Thus, the court finds that officers of reasonable competence *could disagree on whether Plaintiff was* entitled to federal due process based on his sentence to SHU as constituting atypical punishment, *see Lennon, supra*, at 420, and whether any violation actually occurred at the second hearing. Significantly, no loss of good-time credits resulted from the second hearing before Defendant Kihl. Therefore, the conduct of Defendants at the time of the alleged violations was objectively reasonable under then clearly established law, and qualified immunity applies in the instant matter. *See Fox, supra*, at 478.

## CONCLUSION

Based on the foregoing, Defendants' motion for summary judgment (Docket Item No. 47) is GRANTED; Plaintiff's cross-motion for summary judgment (Docket Item No. 57) is DENIED.

SO ORDERED.